REINHARDT, Circuit Judge:
 

 This case requires us to decide whether the new value “exception” to the absolute priority rule survives the enactment of the Bankruptcy Reform Act of 1978 (better known as the Bankruptcy Code), which replaced the Bankruptcy Act of 1898.
 
 [1]
 
 The new value exception allows the shareholders of a corporation in bankruptcy to obtain an interest in the reorganized debtor in exchange for new capital contributions over the objections of a class of creditors that has not received full payment on its claims. Whether this doctrine is viable under the Bankruptcy Code has significant implications for the relative bargaining power of debtors and creditors in Chapter 11 cases. Although no circuit court has taken a definitive position on this question,
 
 dicta
 
 in several opinions demonstrate intra and inter-circuit disagreements. District and bankruptcy courts are sharply divided on the question, as are the commentators. The question will in all probability ultimately be decided by the Supreme Court. In the meantime, we conclude that the new value exception remains a vital principle of bankruptcy law.
 

 I.
 
 BACKGROUND
 

 In 1984-85, Northtown Investments built Bonner Mall. The project was financed by a $6.3 million loan, secured by the mall property, from First National Bank of North Idaho, which later sold the note and deed of trust to appellant U.S. Bancorp Mortgage Co. (“Ban-corp”). In October 1986 the mall was purchased by appellee Bonner Mall Partnership (“Bonner”), subject to the lien acquired by Bancorp. Bonner is composed of six partners, five trusts and one individual investor,
 
 *902
 
 and was formed for the express purpose of buying the mall. Unfortunately, the cash-flow from the mall was much smaller than Bonner expected. When Bonner failed to pay its real estate taxes to Bonner County, Idaho, Bancorp commenced a nonjudicial foreclosure action. After several unsuccessful attempts to renegotiate and restructure Bonner’s debt, Bancorp set a trustee’s sale for March 14, 1991.
 

 On March 13,1991, Bonner filed a Chapter 11 (reorganization) bankruptcy petition, which automatically stayed the foreclosure sale. 11 U.S.C. § 362(a). Bancorp moved for relief from the stay under section 362(d)(2).
 
 [2]
 
 As a condition to obtaining relief under that provision, Bancorp was required to show that Bonner had no equity in the mall and that Bancorp’s claim against Bonner was undersecured.
 
 United Sav. Ass’n of Tex. v. Timbers of Inwood Forest Assoc., Ltd.,
 
 484 U.S. 365, 377, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). Because Bancorp established these facts, the burden shifted to Bonner to prove 1) that its retention of the mall was necessary to an effective reorganization,
 
 [3]
 
 and 2) that there was a reasonable possibility of a successful reorganization within a reasonable time.
 
 [4]
 

 See id
 
 After two hearings on Bancorp’s motion, the bankruptcy court denied it without prejudice. In his order denying relief the bankruptcy judge assumed the continued existence of the new value exception, noted its strict requirements, and expressed doubts whether Bonner could satisfy them. Nevertheless, he allowed Bonner thirty days to propose a plan.
 

 Bonner filed a reorganization plan relying on the new value doctrine. In response Ban-corp renewed its motion to lift the stay. Bancorp argued 1) that the new value exception did not survive the enactment of the Bankruptcy Code; and 2) even if it did, Bonner’s plan was still unconfirmable as a matter of law. The parties stipulated that the motion involved only legal questions, so no evidence was taken. The bankruptcy court accepted Bancorp’s first argument but did not reach the second. The bankruptcy judge noted that after his original order the Fifth Circuit had concluded in its “convincing” decision in
 
 Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),
 
 995 F.2d 1274 (5th Cir.1991),
 
 ’petition for rehearing granted in part and opinion withdrawn in part,
 
 995 F.2d 1284 (5th Cir.) (per curiam),
 
 cert. denied
 
 — U.S. -, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992), that there is no longer a new value exception. On that basis, the judge granted Bancorp’s motion for relief from the automatic stay. After the bankruptcy judge stayed his order at Bonner’s request, Bonner appealed to the district court.
 

 On appeal, the district judge determined that the only issue before him was whether the Bankruptcy Code had eliminated the new value exception. He found that it had not. In doing so he relied on the Supreme Court’s ruling in
 
 Dewsnup v. Timm,
 
 — U.S. -, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), which was handed down after the bankruptcy court’s decision and which emphasized the Court’s reluctance to overturn pre-Code practice (see infra). Moreover, by the time of the district court’s opinion the relevant portion of the Fifth Circuit’s
 
 Greystone
 
 opinion had been withdrawn.
 
 [5]
 
 The district court reversed the judgment of the bankruptcy court and remanded for further proceedings consistent with its opinion. 142 B.R. 911. It refused to address Bancorp’s alternative argument that Bonner’s plan was unconfirma-
 
 *903
 
 ble as a matter of law even if the new value exception survived. Instead, its order stated: “Confirmation of the plan proposed by the Debtor must be addressed by the bankruptcy court on remand.” Bancorp filed a timely appeal to this court. Like the district court, we resolve only the question whether the new value exception survives.
 
 [6]
 
 The issue is one of law. Accordingly, our review is
 
 de novo. See Home Sav. Bank, F.S.B. v. Gillam,
 
 952 F.2d 1152, 1156 (9th Cir.1991).
 

 II.
 
 JURISDICTION
 

 The parties agree that we have jurisdiction to hear Bancorp’s appeal. Nevertheless, we have an independent duty to examine our own subject matter jurisdiction.
 
 Pizza of Hawaii, Inc. v. Shakey’s Inc. (In re Pizza of Hawaii, Inc.),
 
 761 F.2d 1374, 1377 (9th Cir.1985). Twenty Eight U.S.C. section 158(d) provides that “[t]he courts of appeal shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.” Subsection (a) states in relevant part that:
 

 The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and with leave of the court, from interlocutory orders, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.
 

 28 U.S.C. § 158(a).
 
 [7]
 
 For us to have jurisdiction, both the bankruptcy court’s and district court’s orders must be final.
 
 Allen v. Old Nat’l Bank of Wash (In re Allen),
 
 896 F.2d 416, 418 (9th Cir.1990) (per curiam). Here, the bankruptcy court’s order granting relief from the automatic stay was clearly final.
 
 [8]
 

 Packerland Packing Co. v. Griffith Brokerage Co. (In re Kemble),
 
 776 F.2d 802, 805 (9th Cir.1985). Moreover, if Bancorp had foreclosed on the mall, Bonner’s sole significant asset, for all intents and purposes the bankruptcy case would have ended; therefore, the bankruptcy court’s order required immediate appellate review.
 
 See Elliot v. Four Seasons Properties (In re Frontier Properties, Inc.),
 
 979 F.2d 1358, 1363 (9th Cir.1992);
 
 Allen,
 
 896 F.2d at 418.
 

 The more difficult question is whether the district court’s order was final.
 
 [9]
 
 The unique nature of bankruptcy procedure dictates that we take a pragmatic approach to finality.
 
 Vylene Enter. Inc. v. Naugles (In re Vylene Enter. Inc.),
 
 968 F.2d 887, 894 (9th Cir.1992);
 
 Mason v. Integrity Ins. Co. (In re Mason),
 
 709 F.2d 1313, 1318 (9th Cir.1983). Our cases hold that 28 U.S.C. section 158(d) affords a more liberal finality standard than does 28 U.S.C. section 1291.
 
 [10]
 

 Vylene,
 
 968
 
 *904
 
 F.2d at 893-94.
 
 [11]
 

 Under Ninth Circuit law, if the district court
 
 affirms or reverses
 
 a final bankruptcy court order, its order is final.
 
 King v. Stanton (In re Stanton),
 
 766 F.2d 1283, 1287 (9th Cir.1985). However, difficult questions regarding finality sometimes arise when a district court reverses a final order of a bankruptcy court and remands.
 
 Vylene,
 
 968 F.2d at 895. In such circumstances we balance two important policies: avoiding piecemeal appeals and enhancing judicial efficiency.
 
 Id.; Zolg v. Kelly (In re Kelly),
 
 841 F.2d 908, 911 (9th Cir.1988). We also consider the systemic interest in preserving the bankruptcy court’s role as the finder of fact.
 
 Stanton,
 
 766 F.2d at 1287.
 
 [12]
 
 On the basis of our analysis of these factors, we have concluded that when the district court remands for further factual findings related to a central issue raised on appeal, its order is ordinarily not final and we lack jurisdiction.
 
 Id.
 
 at 1286.
 

 However,
 
 Stanton
 
 suggests that we should assert jurisdiction even though a district court has remanded a matter for factual findings on a central issue if that issue is
 
 legal
 
 in nature and its resolution either 1) could dispose of the case or proceeding and obviate the need for factfinding;
 
 [13]
 
 or 2) would materially aid the bankruptcy court in reaching its disposition on remand. 766 F.2d at 1288 n. 8;
 
 see also Farm Credit Bank of Spokane v. Fowler (In re Fowler),
 
 903 F.2d 694, 696 (9th Cir.1990) (citing second
 
 Stanton
 
 criterion with approval). We believe that the
 
 Stanton
 
 principle is sound and we adopt it here. The present case falls squarely within the first
 
 Stanton
 
 criterion. The central question is a legal one that is clearly potentially dispositive. It involves the very existence of the rule pursuant to which the bankruptcy court would be required to make factual findings on remand. If we hold that the new value exception no longer exists, no further factual proceedings will be necessary and Bancorp will be entitled to the relief it seeks as a matter of law.
 

 The instant case presents a situation analogous to the one we faced in
 
 Pizza of Hawaii,
 
 which was cited with approval in
 
 Stanton
 
 and
 
 Fowler.
 
 In
 
 Pizza of Hawaii
 
 the bankruptcy court confirmed Pizza’s proposed plan (a final order) over Shakey’s objection that the plan did not make sufficient provision for a debt that Pizza might owe Shakey’s on account of a pending civil case. On appeal, the district court 1) vacated the order of confirmation; 2) ordered the bankruptcy court to grant Shakey’s leave to amend its proof of claim; 3) ordered the bankruptcy court to value the claim; and 4) ordered the bankruptcy court to reconsider the plan’s feasibility in light of the value of Shakey’s claim. 761 F.2d at 1376. Pizza appealed the order to this court. Despite the fact that the
 
 *905
 
 district court had remanded for proceedings of a factual nature, we held that we had jurisdiction. 761 F.2d at 1378, 1382. Here, as in
 
 Pizza of Hawaii,
 
 the policy of judicial economy, which militates in favor of our asserting jurisdiction, strongly outweighs the need to avoid piecemeal appeals.
 

 For the above reasons, we conclude that we have subject matter jurisdiction over Bancorp’s appeal under 28 U.S.C. section 158(d).
 

 III.
 
 BONNER’S PLAN, CONFIRMATION, AND THE NEW VALUE EXCEPTION
 

 Bonner’s proposed reorganization plan (“the Plan”) provides for the transfer of all of Bonner Mall Partnership’s assets (the mall for all practical purposes) to a new corporation, Bonner Mall
 
 Properties, Inc.,
 
 created by the Plan to carry out its provisions. One of the most significant features of the Plan is the treatment of Bancorp’s $6.6 million claim, for which the mall is collateral. In the course of his original order denying Ban-corp’s motion for relief from the stay, the bankruptcy judge valued the mall at $3.2 million. This meant that Bancorp’s claim against Bonner was undersecured: it was secured as to $3.2 million and unsecured as to $3.4 million.
 
 See
 
 11 U.S.C. § 506(a). The unsecured portion of Bancorp’s claim represents the vast majority of Bonner’s unsecured debt. Under the Plan, the $3.2 million debt to Bancorp secured by the mall would be paid 32 months after the Plan’s confirmation, with interest payments payable monthly in the interim. Payment of all other secured debt would be deferred. All unsecured creditors of Bonner who are owed more than $1000 would be paid according to a pro-rata distribution of 300,000 shares of preferred stock in the new corporation. Each share would be valued at $1.00.
 
 [14]
 
 The preferred stock would be convertible to a maximum of 300,000 shares of common stock once Bonner paid off the secured part of Bancorp’s claim.
 

 Under the Plan the equity owners,
 
 i.e.
 
 the partners, would receive nothing on their claims. However, to raise additional capital for the new corporation, the partners would contribute a total of $200,000 in cash to Bonner Mall Properties in exchange for 2 million of the 4 million authorized shares of the new corporation’s common stock. No other persons are designated to receive stock in exchange for such contributions. The Plan also states that the partners would subsidize any shortfall in working capital during the first 32 months after confirmation of the plan.
 
 [15]
 
 Moreover, the trustee for the five trust-partners of Bonner Mall Partnership is to contribute a collateral trust mortgage on a 4500-acre property as a guarantee of payment of the debts assumed by Bonner Mall Properties.
 
 [16]
 
 In exchange, the new corporation is to service part of the trustee’s debt on the property.
 

 Section 1129(a) of Chapter 11 establishes thirteen requirements for confirmation of a reorganization plan, all of which must generally be satisfied. One such requirement is set forth in subsection (a)(8), which mandates that “[w]ith respect to each class [of claims], A) such class has voted to accept the plan or B) such class is not impaired under the plan.” 11 U.S.C. § 1129(a)(8).
 
 [17]
 
 Under Bonner’s Plan all claim classes are impaired and, therefore, all must accept the plan for a consensual confirmation. It is a foregone conclusion that at least the unsecured class of which Bancorp is the principal member will vote not to confirm the plan in view of the minimal return Bancorp will receive on the unsecured fraction of its claim.
 

 
 *906
 
 However, the Code provides that where all requirements for confirmation but section 1129(a)(8) are met, the bankruptcy court
 
 shall
 
 confirm a Chapter 11 reorganization plan over the objection of an impaired class or classes “if the plan does not discriminate unfairly, and is
 
 fair and equitable,
 
 with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.” 11 U.S.C. § 1129(b)(1) (emphasis added). This form of confirmation is commonly known in bankruptcy parlance as a “cram-down” because the plan is crammed down the throats of the objecting class(es) of creditors. The issue before the bankruptcy judge in deciding whether to grant Bancorp’s motion for relief from the stay was whether Bonner’s Plan had a reasonable possibility of confirmation in a cramdown,
 
 i.e.,
 
 whether the standards set forth in section 1129(b)(1) could feasibly be satisfied.
 

 The resolution of this question turns on whether there is a reasonable possibility that a bankruptcy judge could find Bonner’s Plan “fair and equitable.” Section 1129(b)(2) of the Code defines “fair and equitable” as
 
 including
 
 several enumerated
 
 requirements.
 
 The section, which is at the heart of the controversy between the parties, states,
 
 inter alia,
 
 that a plan will be considered “fair and equitable” only if:
 

 (B) With respect to a class of unsecured claims—
 

 (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim;
 
 or
 

 (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.
 

 (emphasis added). Section 1129(b)(2)(B) is a two-part codification of the judge-made absolute priority rule, compliance with which was a prerequisite to any determination that a plan was “fair and equitable” under the Bankruptcy Act.
 

 Here, each of the unsecured claims against Bonner will not be paid in full on the effective date of the Plan. As a result, section 1129(b)(2)(B)(i) cannot be satisfied. Therefore, Bonner’s Plan cannot be held to be “fair and equitable” unless it complies with the provisions of section 1129(b)(2)(B)(ii). If it fails to meet the requirements of that section it is unconfirmable as a matter of law. A critical area of dispute in this case is whether Bonner’s Plan violates section 1129(b)(2)(B)(ii) and, in turn, the absolute priority rule and the “fair and equitable” principle.
 

 Under pre-Code Bankruptcy Act practice, a plan that allowed stockholders in the business that had filed for bankruptcy protection (old equity) to receive stock in the reorganized debtor in exchange for contributions of added capital (new value) could under certain conditions satisfy the absolute priority rule and be considered “fair and equitable” even though a senior class was not paid in full.
 
 See Case v. Los Angeles Lumber Products Co.,
 
 308 U.S. 106, 121, 60 S.Ct. 1, 10, 84 L.Ed. 110 (1939);
 
 Marine Harbor Properties, Inc. v. Manufacturers Trust Co.,
 
 317 U.S. 78, 85-86, 63 S.Ct. 93, 97-98, 87 L.Ed. 64 (1942);
 
 Mason v. Paradise Irrigation Dist.,
 
 326 U.S. 536, 541-43, 66 S.Ct. 290, 292-93, 90 L.Ed. 287 (1946). That set of conditions became known collectively as the “new value exception” to the absolute priority rule; the terms of that “exception” will be discussed below.
 

 Although the question we must ultimately answer is whether the new value exception survived the enactment of the Bankruptcy Code, we should note, preliminarily, that the term “exception” is misleading. The doctrine is not actually an exception to the absolute priority rule but is rather a corollary principle, or, more simply a description of the limitations of the rule itself. It is, as indicated above, the set of conditions under which former shareholders may lawfully obtain a priority interest in the reorganized venture. The Supreme Court appeared to recognize as much in
 
 Case v. Los Angeles Lumber
 
 when it stated that if a new capital contribution satisfies certain conditions “the creditor cannot complain that he is not accorded full right of priority against the corporate assets.” 308 U.S. at 122, 60 S.Ct. at 10 (internal quotation
 
 *907
 
 omitted). More properly, the new value exception should be called something like the “new capital-infusion doctrine” or as one commentator has suggested, “the scrutinize old equity participation rule.” Elizabeth Warren,
 
 A Theory of Absolute Priority,
 
 1991 Annual Survey of American Law 9, 42.
 

 The question whether the adoption of the Code served to eliminate the new value exception was before the Supreme Court in
 
 Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988). While there is language in the opinion questioning the viability of the doctrine, the Court explicitly stated that it was not deciding the issue.
 
 [18]
 
 Instead, the Court assumed that the doctrine existed but found that all of its requirements were not satisfied under the facts of that case. Since Ahlers,
 
 [19]
 
 several court of appeals have avoided a direct holding on the viability of the “exception” by using the same stratagem.
 
 [20]
 

 Other appellate courts have given mixed signals on whether the principle survives. The Seventh Circuit seems internally divided on the question: In one case it analyzed a reorganization plan in light of the exception, while stating that the status of the doctrine is an open question after
 
 Ahlers;
 
 another panel criticized the exception and strongly hinted that it is moribund; and a third stopped just short of holding that the exception survives.
 
 [21]
 
 The Fourth Circuit has suggested that if the new value exception exists it is narrow in scope.
 
 [22]
 
 Our own Bankruptcy Appellate Panel has recognized the continued existence of the exception.
 
 See Carson Nugget, Inc. v. Green (In re Green),
 
 98 B.R. 981, 982 (BAP 1989) (per curiam).
 

 While there is a division in the district and bankruptcy courts of our circuit and nationwide, the majority of courts that have considered the question have held that the new value exception is alive and well. We share the view that the doctrine remains a vital legal principle. Accordingly, we hold that the Code permits the confirmation of a reorganization plan that provides for the infusion of capital by the shareholders of the bankrupt corporation in exchange for stock if the plan meets the conditions that plans were required to meet prior to the Code’s adoption.
 

 IV.
 
 THE NEW VALUE EXCEPTION AND THE CODE
 

 Our explanation of why we hold that the new value exception survives will address several distinct but related issues. First, we determine that the Code provision codifying the absolute priority rule does not prohibit confirmation of a new value plan. Second, we decide that Congress’ failure expressly to include the new value doctrine as a standard to be considered in applying the “fair and equitable” principle does not reflect an intent
 
 *908
 
 to eliminate the exception. Finally, we conclude that the new value exception is fully consistent with the structure and underlying policies of Chapter 11.
 

 A.
 
 The Codification of the Absolute Priority Rule Does Not Serve to Eliminate the New Value Exception.
 

 The parties take diametrically opposed positions as to the consistency of the new value exception with 11 U.S.C. section 1129(b)(2)(B)(ii). Bancorp argues that: 1) Bonner’s Plan violates the absolute priority rule because the old equity owners will have an ownership interest in the new company even though Bancorp’s unsecured claim will not be paid in full and 2) the plain meaning of 11 U.S.C. section 1129(b)(2)(B)(ii) demonstrates that the new value exception did not survive the enactment of the Code. Bonner contends that: 1) the infusion of new capital from a source outside the bankruptcy estate, even if the source is a former equity holder, is an independent act that does not violate the absolute priority rule and 2) section 1129(b)(2)(B)(ii) does not forbid confirmation of plans that meet the requirements of the new value exception.
 

 In determining whether section 1129(b)(2)(B)(ii) abolishes the new value exception we apply the traditional tools of statutory construction. The interpretation of a statutory provision must begin with the plain meaning of its language.
 
 Pennsylvania Public Welfare Dept. v. Davenport
 
 495 U.S. 552, 557, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990). Where statutory language is unambiguous the judicial inquiry is complete.
 
 Connecticut Nat. Bank v. Germain,
 
 — U.S. -, -, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). It is a cardinal principle of statutory construction that a court must give effect, if possible, to every clause and word of a statute.
 
 Negonsott v. Samuels,
 
 — U.S. -, -, 113 S.Ct. 1119, 1123, 122 L.Ed.2d 457 (1993). When the statutory scheme is coherent and consistent, there generally is no need for a court to inquire beyond the plain language.
 
 United States v. Ron Pair Enterp., Inc.,
 
 489 U.S. 235, 240-41, 109 S.Ct. 1026, 1029-30, 103 L.Ed.2d 290 (1988). Applying these familiar rules, we conclude that the plain language of section 1129(b)(2)(B)(ii) demonstrates that Bonner’s, and not Ban-corp’s, reading of the provision is correct.
 

 1. Because Qualifying New Value Plans Do Not Give Old Equity Holders Stock in the Reorganized Debtor “On Account Of” Their Prior Ownership Interests, They Do Not Violate 11 U.S.C. Section 1129(b)(2)(B)(ii).
 

 Eleven U.S.C. section 1129(b)(2)(B)(ii) requires that a plan provide that with respect to a class of unsecured claims that has not received full payment—
 

 the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan
 
 on account of such junior claim or interest
 
 any property, (emphasis added)
 

 In plainer English the provision bars old equity from receiving any property via a reorganization plan
 
 “on account of’
 
 its prior equitable ownership when all senior claim classes are not paid in full.
 
 E.g, Snyder v. Farm Credit Bank of St. Louis (In re Snyder),
 
 967 F.2d 1126, 1130 (7th Cir.1992);
 
 Teamsters Nat’l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.),
 
 800 F.2d 581, 588 (6th Cir.1986);
 
 Prudential Ins. Co. v. F.A.B. Indus. (In re F.A.B. Indus.),
 
 147 B.R. 763, 768-69 (C.D.Cal.1992),
 
 appeal docketed,
 
 No. 93-55055 (9th Cir. Jan. 13, 1993);
 
 In re Pullman Construction Indus,
 
 107 B.R. 909, 944 (N.D.Ill.1989). The central inquiry in determining the reach of the prohibition is the meaning of the critical words “on account of’.
 

 We have no difficulty in reconciling the “on account of’ language with the new value exception. Under Bankruptcy Act practice, old equity was required to meet several requirements in order to take advantage of that doctrine. Former equity owners were required to offer value that was 1) new, 2) substantial, 3) money or money’s worth, 4) necessary for a successful reorganization and 5) reasonably equivalent to the value or interest received.
 
 Case v. Los Angeles Lumber,
 
 308 U.S. at 121-22, 60 S.Ct. at 10-11;
 
 Snyder,
 
 967 F.2d at 1131. Several courts have concluded that if a proposed plan satisfies all of these requirements,
 
 i.e.
 
 the new
 
 *909
 
 value exception, it will not violate section 1129(b)(2)(B)(ii) of the Code and the absolute priority rule. Such a plan, they reason, will
 
 not
 
 give old equity property
 
 “on account of’
 
 prior interests, but instead will allow the former owners to participate in the reorganized debtor
 
 on account of
 
 a substantial, necessary, and fair new value contribution.
 
 E.g., U.S. Truck,
 
 800 F.2d at 588;
 
 The Penn Mutual Life Ins. Co. v. Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership),
 
 134 B.R. 165, 168, 172-74 (Bankr.D.Md.1991). We agree with their analysis.
 

 We recognize that in some larger sense the reason that former owners receive new equity interests in reorganized ventures is that they are former owners. But it is also true that in new value transactions old equity owners receive stock in exchange for the additional capital they invest. Causation for any event has many and varied levels. Here, the answer to the meaning of the phrase “on account of’ lies in the level of causation Congress had in mind when it prohibited old equity owners from receiving property “on account of’ their prior interests. A reading of the full text of section 1129(b)(2)(B)(ii) makes it clear that what Congress had in mind was direct or immediate causation rather than a more remote variety, and that it did not intend to prohibit persons who receive stock because they have provided new capital from becoming participants in the reorganized debtor simply because they were also owners of the original enterprise.
 
 [23]
 

 Had Congress intended that old equity never receive any property under a reorganization plan where senior claim classes are not paid in full, it could simply have omitted the “on account of’ language from section 1129(b)(2)(B)(ii). We would then be left with an absolute prohibition against former equity owners’ receiving or retaining property in the reorganized debtor in such circumstances. The expansive reading of the phrase “on account of such junior claim or interest” suggested by Bancorp would lead to the identical result, thus rendering the disputed phrase superfluous. Under that interpretation any distribution to old equity would always be “on account of’ its former interest in some sense. We decline Bancorp’s invitation to nullify Congress’ deliberate use of the term “on account of such junior claim or interest”, particularly since nearly identical language can be found throughout the Code.
 
 [24]
 
 Congress must have intended the “on account of’ language to have some significant meaning as well as some particular limiting effect.
 

 We believe that Congress intended the “on account of’ phrase in section 1129(b)(2)(B)(ii) to require bankruptcy courts to determine whether a reorganization plan that gives stock to former equity holders does so primarily because of their old interests in the debtor or for legitimate business reasons. The new value doctrine provides the means by which a court can discover whether a particular new capital transaction is proposed “on account of’ old equity’s prior ownership or “on account of’ its new contribution. In other words, in evaluating whether a reorganization plan satisfies the requirements of the new value exception a court is in fact determining whether old equity is unjustifiably attempting to retain its corporate ownership powers in violation of the absolute priority rule or whether there is genuine and fair exchange of new capital for an equity interest.
 

 Contrary to Bancorp’s contentions, section 1129(b)(2)(B)(ii) does not by its terms eliminate, or even refer to, the new value excep-
 
 *910
 
 tíon.
 
 [25]
 
 Rather, the language of that section and the requirements of the new value principle complement each other. Consequently, the fact that a reorganization plan provides for a new value transaction does not in and of itself violate 11 U.S.C. section 1129(b)(2)(B)(ii) and the absolutely priority rule.
 

 2. The “On Account Of’ Language of Section 1129(b)(2)(B)(ii) Does Not Bar Plans That Give Old Equity Alone the Opportunity to Acquire Stock for a New Capital Contribution.
 

 As Bancorp notes, several courts have held that where a reorganization plan gives old equity
 
 alone
 
 the right to obtain an interest in the reorganized debtor in exchange for new value, as Bonner’s Plan does, the old equity holders are given “property”
 
 on account of their prior ownership interests
 
 and the absolute priority rule is violated. The Fourth Circuit held that such plans violate section 1129(b)(2)(B)(ii), even assuming the new value exception still exists.
 
 Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),
 
 961 F.2d 496, 504 (4th Cir.),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992);
 
 [26]
 

 see also In re A.V.B.I., Inc.,
 
 143 B.R. 738, 740-41 (Bankr.C.D.Cal.1992) (holding new value exception does not survive the Code);
 
 In re Outlook/Century, Ltd.,
 
 127 B.R. 650, 654 (Bankr.N.D.Cal.1991);
 
 Lumber Exchange Ltd. Partnership v. The Mut. Life Ins. Co. of N.Y. (In re Lumber Exchange Ltd. Partnership),
 
 125 B.R. 1000, 1008 (Bankr.D.Minn.),
 
 aff'd,
 
 134 B.R. 354 (D.Minn.1991),
 
 aff'd,
 
 968 F.2d 647 (8th Cir.1992). Under this analysis the “property” given to old equity in violation of the absolute priority rule is
 
 not
 
 the stock in the reorganized debtor received in exchange for a new value contribution. Rather
 
 “[the] exclusive right
 
 of [the] Debtor’s existing partners to obtain equity interests in [the] Debtor itself constitutes property that the partners retain ‘on account of their existing interests.”
 
 Outlook/Century,
 
 127 B.R. at 654 (emphasis added).
 

 We disagree with this analysis. Even assuming that an exclusive opportunity is “property”,
 
 [27]
 
 it does not follow that such an opportunity is property received or retained “on account of’ old equity’s prior ownership interests in the debtor. A proposed reorganization plan may give old equity the exclusive opportunity to purchase stock in exchange for new capital for other reasons.
 
 [28]
 
 
 *911
 
 Exclusivity may be given because the plan proponent may believe that the participation of old equity in the new business will enhance the value of the business after reorganization. It is possible the debtor will conclude that additional funding will be easier to obtain if the old owners, the most likely investors, know in advance that their partners will all be familiar faces. Even more important, it may be apparent to the proponents of the plan that there will be no other legitimate investors who would be willing to put substantial capital into a business that is just emerging from Chapter 11 protection.
 
 [29]
 
 As the Supreme Court has stated “[generally, additional funds will be essential to the success of the undertaking, and it may be impossible to obtain them unless stockholders are permitted to contribute and retain an interest sufficiently valuable to move them.”
 
 Kansas City Terminal Ry. Co. v. Central Union Trust Co.,
 
 271 U.S. 445, 455, 46 S.Ct. 549, 552, 70 L.Ed. 1028 (1926);
 
 accord Mason v. Paradise Irrigation Dist.,
 
 326 U.S. 536, 541-43, 66 S.Ct. 290, 292-93, 90 L.Ed. 287 (1946) (new money may not be available unless there is a “strong inducement”). The proponent of a plan may have good reason to believe that old equity would not participate without the incentive of an exclusive opportunity.
 

 As stated earlier, whether a particular plan gives old equity a property interest “on account of’ its old ownership interests in violation of the absolute priority rule or for another, permissible reason is a factual question. The answer depends upon whether the requirements of the new value exception are met. We believe that this same analysis applies whether a plan gives old equity an exclusive or non-exclusive right of participation in a new value transaction. What matters instead is whether the proposed transaction meets the criterion “necessary to the success of the reorganization”.
 
 [30]
 
 In other words, if an exclusive participation plan satisfies that requirement, then it allows the partners the sole right to participate in a new value transaction not because of illegitimate collusion between old equity and the plan proponent but because such participation is necessary for a successful reorganization and in the best interests of all concerned. Of course, any exclusive participation plan must also fulfill the new value doctrine’s four other requirements as well.
 

 In sum, where the strictures of the new value exception are met, there is simply no violation of the absolute priority rule, whether the plan provides for exclusive or nonexclusive participation, because old equity will not retain or receive property “on account of’ its old ownership interests in violation of section 1129(b)(2)(B)(ii).
 

 B.
 
 Congress’ Failure to List the New Value Exception as a Specifíc Doctrine Permitted under the “Fair and Equitable” Principle Does Not Demonstrate an Intent to Eliminate It.
 

 While the absolute priority rule clearly does not
 
 prohibit
 
 confirmation of a new value exception plan in a cramdown, this does not necessarily mean that the “fair and equitable” provisions of the Code should be interpreted as
 
 permitting
 
 confirmation of such a plan. Bancorp argues that Congress’ failure expressly to provide for the continuation of the new value exception in the provision setting forth the requirements of the “fair and equitable” principle must be interpreted as an implicit statement that it did not intend the doctrine to survive the adoption of the Code. Recognizing that the Code does not unambiguously allow for new capital contribution plans, Bonner argues that such plans are consistent with the “fair and equitable” principle and that despite the absence of an express provision, Congress intended to maintain the new value exception.
 

 
 *912
 
 Bonner relies upon “the normal rule of statutory construction ... that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific.”
 
 Midlantic Nat’l. Bank v. New Jersey Dept. of Envtl. Protection,
 
 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986) (citations omitted);
 
 Kelly v. Robinson,
 
 479 U.S. 36, 47, 107 S.Ct. 353, 359, 93 L.Ed.2d 216 (1988). This rule is followed with particular care in construing the Bankruptcy Code.
 
 Midlantic,
 
 474 U.S. at 501, 106 S.Ct. at 759. When Congress amends the bankruptcy laws, it does not start from scratch.
 
 See Dewsnup v. Timm,
 
 — U.S. -, -, 112 S.Ct. 773, 779 (1992). The Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so.
 
 Pennsylvania Public Welfare Dept. v. Davenport,
 
 495 U.S. 552, 563, 110 S.Ct. 2126, 2133, 109 L.Ed.2d 588 (1990).
 
 [31]
 

 At oral argument Bancorp suggested that the new value exception was mentioned once in
 
 dicta
 
 by the Supreme Court in
 
 Case v. Los Angeles Lumber Products
 
 and thereafter never heard from again. Consequently, Ban-corp argues that Congress would not have known of the principle when it enacted the Code.
 
 Cf. United States v. Ron Pair Enterp., Inc.,
 
 489 U.S. 235, 246, 109 S.Ct. 1026, 1033, 103 L.Ed.2d 290 (1988) (practice of denying post-petition interest to holders of non-consensual liens was an exception to an exception practiced only by a few courts so Congress would not have known of it). We disagree.
 

 There is simply no question that the new value exception was an established pre-Code Bankruptcy practice of which Congress would have had (and did have) knowledge.
 
 Snyder v. Farm Credit Bank of St. Louis (In re Snyder),
 
 967 F.2d 1126, 1129 (7th Cir.1992). First, several Supreme Court cases had mentioned the principle, albeit the last time in 1946. Second, several appellate court cases recognized the new value doctrine after 1946:
 
 E.g., Phelan v. Middle States Oil Corp.,
 
 220 F.2d 593, 614 (2d Cir.),
 
 cert. denied,
 
 349 U.S. 929, 75 S.Ct. 772, 99 L.Ed. 1260 (1955);
 
 Security & Exch. Comm’n v. Canandaigua Enterp. Corp.,
 
 339 F.2d 14, 21 (2d Cir.1964). Finally, a proposal to broaden the new value exception was put before Congress during the drafting of the Code. While the proposal was rejected, that action demonstrates that Congress knew of the doctrine when it enacted the Code.
 

 Once it has been shown that Congress was aware of a pre-Code practice, the remaining inquiry under
 
 Dewsnup
 
 and
 
 Davenport
 
 is whether it has made clear its intent to change that practice. Bancorp argues that the codification of the formerly judicially-defined concept of “fair and equitable” without a reference to the new value exception shows Congress’ clear intent to eliminate the doctrine.
 
 [32]
 

 See In re A.V.B.I., Inc.,
 
 143 B.R. 738, 743 (C.D.Cal.1992). However, section 1129(b)(2) explicitly defines the term “fair and equitable” as merely
 
 including
 
 the general requirements listed in the Code and expressly leaves room for additional factors to be considered in applying the principle in other particular circumstances.
 
 See
 
 11 U.S.C. § 102(3) (defining “includes” as “not limiting”). There is nothing in the language of the Code that suggests that courts cannot continue to apply the requirements of the new value exception in determining whether a plan that affords old equity a property interest in exchange for a capital contribution is “fair and equitable”.
 
 See Official Creditors’ Comm. ex rel. Class 8 Unsecured Creditors v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.),
 
 781 F.2d 99,
 
 *913
 
 101-02 (7th Cir.1986). In any event, the text of section 1129(b)(2) does not evidence the clear intent necessary to support a conclusion that Congress decided to eliminate the new value doctrine; silence is not a sufficient basis from which we may infer such a purpose.
 
 See Kelly,
 
 479 U.S. at 47, 107 S.Ct. at 359.
 

 Where the text of the Code does not unambiguously abrogate pre-Code practice, courts should presume that Congress intended it to continue unless the legislative history dictates a contrary result.
 
 See Dewsnup,
 
 — U.S. at -, 112 S.Ct. at 779. It does not do so here. If anything, the legislative history of the Code supports the continued existence of the new value doctrine. It contains statements by sponsors of the Code that although section 1129(b)(2) lists several specific factors interpreting “fair and equitable”, others were omitted to avoid statutory complexity and because courts would independently find that they were fundamental to “fair and equitable treatment”.
 
 [33]
 

 See
 
 124 Cong.Rec. 32407 (Sept. 28, 1978) (Statement of Rep. Don Edwards); 124 Cong.Rec. 34006 (Oct. 5, 1978) (statement of Senator Dennis DeConcini). This legislative history is evidence that Congress enacted the Code with knowledge that other, judicially-created standards governing the application of the “fair and equitable” principle existed and that it failed to include such standards for reasons other than an intent to eliminate them.
 

 As stated earlier, in enacting the Code Congress rejected a proposal by the Bankruptcy Commission to expand the new value exception significantly.
 
 See
 
 Victor Brudney,
 
 The Bankruptcy Commission’s Proposed Modifications of the Absolute Priority Rule,
 
 48 Am.Bankr.L.J. 305, 335-36 (1974). That proposal would have eliminated the “money or money’s worth” requirement set forth in
 
 Case v. Los Angeles Lumber
 
 and permitted new “important” contributions, including contributions of management, to suffice.
 
 Report of the Commission on the Bankruptcy Laws of the United States,
 
 H.R.Doc. No. 93-137, 93d Cong., 1st Sess., pt. I, 258-59; pt. II, §§ 7-303(7), 7-310 (1973);
 
 Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 205-06, 108 S.Ct. 963, 968-69, 99 L.Ed.2d 169 (1988). Congress’ rejection of the Bankruptcy Commission’s proposal shows only that it did not want to broaden the exception; it does not indicate rejection of the exception itself.
 
 Travelers Ins. Co. v. Bryson Properties, XVIII, (In re Bryson Properties, Inc., XVIII),
 
 961 F.2d 496, 504 n. 13 (4th Cir.),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992). Indeed, “the Commission’s proposal presupposed the existence of the new value exception, and Congress’s rejection of the modification could just as easily be construed as an endorsement of the status quo.”
 
 Snyder,
 
 967 F.2d at 1130.
 

 In sum, neither the text nor the legislative history of section 1129(b)(2) justifies the conclusion that the new value exception was eliminated.
 
 See Bryson,
 
 961 F.2d at 504 n. 13. Congress’ failure to include explicitly the well-established requirements of the new value exception in section 1129(b)(2) is of no assistance to Bancorp. Given that there is no evidence of a clear intent on the part of Congress to eliminate the new value exception in either the statutory text or the legislative history, under
 
 Dewsnup
 
 and
 
 Davenport
 
 pre-Code practice continues to apply.
 

 C.
 
 Congress’ Overhaul of the Reorganization Process Does Not Justify a Conclusion that the New Value Exception was Abolished.
 

 Bancorp contends that where the Code totally revamps an area of bankruptcy law, pre-Code practice may appropriately be ignored. Bancorp relies on
 
 Union Bank v. Wolas,
 
 — U.S. -, 112 S.Ct. 527, 116 L.Ed.2d 514 (1992), in support of this proposition. In
 
 Wolas
 
 the Court unanimously found that the text of the Code sharply limited the pre-Code practice at issue. Under the Bankruptcy Act a trustee could avoid a debtor’s payments on a long-term debt if they were made during the ninety days prior to bankruptcy. However, he could not avoid
 
 *914
 
 such payments made on current expenses. In contrast, section 547(c)(2) of the Code states that a trustee cannot avoid payments made during the prescribed period if they were in the “ordinary course of [the debtor’s] business or financial affairs”. The Court found that the plain meaning of this Code section circumscribed the trustee’s pre-Code avoidance powers with respect to long term debt. — U.S. at -, 112 S.Ct. at 530. While the
 
 Wolas
 
 Court relied in part upon the major changes made to the statutory framework by the enactment of the Code, it did so only as a
 
 confirmation
 
 of its earlier conclusion that the plain text of the Code provision altered pre-Code practice. — U.S. at -, -, 112 S.Ct. at 530, 532. Here, and as shown above, the language of the text at issue, section 1129(b)(2), does not by its terms affect the new value exception in any respect.
 

 Bancorp next argues that the changes made to the reorganization process were more drastic than those at issue in
 
 Wolas
 
 and therefore pre-Code practice should be discarded. As Bancorp notes, under the Bankruptcy Act there were two reorganization chapters, X (publicly held companies) and XI (privately held companies), which varied in certain important respects.
 
 [34]
 
 On the one hand, Congress’ combining them into a single reorganization chapter was a significant Code innovation.
 
 See A.V.B.I.,
 
 143 B.R. at 747. On the other hand, the new Chapter 11 shifted bargaining power away from creditors and in favor of debtors. Consequently, it made plan confirmation easier. While it might be, as Bancorp argues, that the new value exception is not as necessary under the current regime,
 
 see also In re Outlook/Century, Ltd.,
 
 127 B.R. 650, 657 (Bankr.N.D.Cal.1991), we believe that the structural changes to the reorganization process made by the Code are in harmony with the pro-confirmation principle underlying the new value exception. Accordingly, these changes cannot carry Bancorp’s argument that the new value doctrine is no longer viable.
 

 Specifically, Bancorp recounts that under the Act voting on the confirmation of a plan was by individual creditors rather than by classes of creditors, as is the case under the Code.
 
 [35]
 
 It contends that the new value exception was designed merely to prevent one dissenting creditor from preventing confirmation.
 
 See Lumber Exchange Ltd. Partnership v. The Mut. Life Ins. Co. of N.Y. (In re Lumber Exchange Ltd. Partnership),
 
 125 B.R. 1000, 1007 & n. 10 (Bankr.D.Minn.),
 
 aff'd
 
 134 B.R. 354 (D.Minn.1991),
 
 aff'd
 
 968 F.2d 647 (8th Cir.1992). However, there is no significant difference between the problem that a holdout class poses for confirmation and that posed by a holdout creditor.
 
 Woodscape Ltd. Partnership (In re Woodscape Ltd. Partnership),
 
 134 B.R. 165, 168, 171 (Bankr.D.Md.1991). While Bancorp assumes that the new value exception was intended to solve a no longer existent individual holdout problem, it could just as logically be argued that the new value exception was designed to prevent confirmation holdouts, individual or class, from derailing an otherwise “fair and equitable” plan.
 
 See In re Pullman Construction Indus.,
 
 107 B.R. 909, 944-45 (Bankr.N.D.Ill.1990). From this perspective, the rationale for the new value exception is as applicable today as it ever was, and there is no reason for us to view it as defunct.
 

 Bancorp also contends that the Code meant to give creditors, not the bankruptcy court, the power to decide when to waive the absolute priority rule.
 
 See Kham & Nate’s Shoes No. 2 v. First Bank,
 
 908 F.2d 1351, 1360 (7th Cir.1990) (creditors effectively own bankrupt firms and they should decide whether old equity should participate). It is true that 11 U.S.C. section 1126(c) allows creditors to consent to confirmation of a plan that does not comply with the absolute priority rule. However, that section permits creditors to waive a priority
 
 they
 
 possess. The new value exception allows bankruptcy courts to afford a priority to
 
 others
 
 over the creditors. There is simply no logical analysis that would allow us to conclude that by per
 
 *915
 
 mitting creditors to waive their own priority Congress demonstrated the intent to deprive bankruptcy courts of
 
 their
 
 power to afford investors of new capital a priority over an impaired class of creditors. Moreover, the very purpose of the Code’s cramdown provision, section 1129(b), which had no direct equivalent under the Act, is to allow the court, and not the creditors, to decide whether a “fair and equitable” plan should be confirmed over creditor objections. While creditor autonomy is certainly an important aspect of the reorganization process, the argument that the new value exception impedes that autonomy is really a complaint against the practice of confirmation by cram-down. That grievance cannot be addressed here.
 

 Finally, Bancorp argues that the Code’s creation of the entity of the debtor-in-possession to run the business in lieu of a trustee would cause self-dealing by insiders if the new value exception were still allowed.
 
 See A.V.B.I.,
 
 143 B.R. at 743. However, the very purpose of the Code’s creation of the debtor-in-possession was to increase the power of those in control of the debtor during the reorganization process. Bankruptcy law is very formalistic in that it treats the debtor, the debtor-in-possession, and old equity as legally distinct entities when in reality they may all be one and the same.
 
 See, e.g., In re Kendavis Industries Int'l, Inc.,
 
 91 B.R. 742, 751, 754 (N.D.Tex.1988) (law firm has conflict of interest in representing both the debtor and equity in bankruptcy proceeding);
 
 In re Rusty Jones, Inc.,
 
 134 B.R. 321, 343 (Bankr.N.D.Ill.1991) (same). The risk of self-dealing among these entities at the expense of creditors is a risk created by the Code itself. The stringent requirements of the new value exception are designed to mitigate that risk. The enactment in the Code of changes that aggravate the self-dealing problem constitutes good reason for courts to make certain that a proposed new value plan strictly adheres to the requirements of the exception. The modifications to the reorganization process are not, however, cause for us to ignore several decades of bankruptcy practice in determining Congress’ intent with respect to the new value exception.
 

 Despite all of the differences between the Act and the Code, the primary rationale for the new value exception has not been eliminated by any statutory alteration to the confirmation process. The new value exception is based on “practical necessit[y]”, on the recognition that new money frequently could not be obtained for the reorganized debtor in the absence of that doctrine.
 
 See Mason v. Paradise Irrigation Dist.,
 
 326 U.S. 536, 542, 66 S.Ct. 290, 292 (1946);
 
 Kansas City Terminal Ry. Co. v. Central Union Trust Co.,
 
 271 U.S. 445, 455, 46 S.Ct. 549, 551 (1926). That practical necessity remains just as pertinent under the Code. Where the main justification for a long-term judicially sanctioned practice has not dissipated, either through a change in conditions or by way of legislative amendment, there is simply no reason to disregard the practice absent a clear legislative intent to abolish it. Bancorp’s structural-change arguments simply do not convince us that pre-Code practice should be ignored in this case.
 

 D.
 
 The New Value Exception is Consistent with the Underlying Policies of Chapter 11.
 

 In interpreting statutory language we are not confined to the specific provision at issue but may look to the structure of the law as a whole and to its object and policy.
 
 Patterson v. Shumate,
 
 — U.S. -, -, 112 S.Ct. 2242, 2246-47, 119 L.Ed.2d 519 (1992);
 
 Kelly v. Robinson,
 
 479 U.S. 36, 43, 107 S.Ct. 353 (1986). Chapter 11 has two major objectives 1) to permit successful rehabilitation of debtors
 
 (NLRB v. Bildisco and Bildisco,
 
 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984)); and 2) to maximize the value of the estate
 
 (Toibb v. Radloff,
 
 — U.S. -, -, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991)). The new value exception, properly applied, serves both goals. By permitting prior stockholders to contribute new’’ money in exchange for participation in the reorganized company, the debtor is given an additional source of capital. The new contribution increases the amount available for the estate to use both in its reorganization and in funding the plan and paying creditors. Without the inducement of participation in the reorganized
 
 *916
 
 debtor, the new money may be unavailable.
 
 Mason v. Paradise Irrigation,
 
 326 U.S. at 542, 66 S.Ct. at 292. All parties involved, including the creditors, benefit from an increase in the assets of the estate.
 

 “ ‘Prior owners are a source of capital different in kind from new investors in that they have an ongoing role in the reorganization and a prior investment in the company.’ ”
 
 Prudential Ins. Co. v. F.A.B. Indus. (In re F.A.B. Indus.),
 
 147 B.R. 763, 769 n. 13 (C.D.Cal.1992) (quoting Nimmer,
 
 supra
 
 note 23, at 1050),
 
 appeal docketed,
 
 No. 93-55055 (9th Cir. Jan. 13, 1993). Moreover, in many situations the new value exception allows control and management of the company to remain with the original owners, who arguably can best reestablish a profitable business. Old owners may have valuable expertise and experience that outside investors lack.
 
 Snyder v. Farm Credit Bank of St. Louis (In re Snyder),
 
 967 F.2d 1126, 1130 (7th Cir.1992). Some studies demonstrate that reorganizations have been more successful when former management was allowed to use its expertise in running the business. Harvey Miller,
 
 Commentary on Absolute Priority,
 
 1991 Annual Survey of American Law 49, 50.
 

 It has been argued that the new value exception allows old equity to repurchase the business at a bargain price, while superior creditors go unpaid, and that this result is contrary to the Chapter 11 policy of protect ing creditor interests.
 
 See, e.g., A.V.B.I.,
 
 143 B.R. at 747. We believe that this argument is incorrect in two respects. First, while the protection of creditors’ interests is an important purpose under Chapter
 
 11,
 

 [36]
 

 the Supreme Court has made clear that successful debtor reorganization and maximization of the value of the estate are the primary purposes.
 
 [37]
 

 See Bildisco,
 
 465 U.S. at 527, 104 S.Ct. at 1196;
 
 Toibb v. Radloff,
 
 — U.S. -, 111 S.Ct. at 2201. Chapter 11 is designed to avoid liquidations under Chapter 7, since liquidations may have a negative impact on jobs, suppliers of the business, and the economy as a whole.
 
 See United States v. Whiting Pools, Inc.,
 
 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983). The ability of stockholders to remain in possession and control of operations, rehabilitate the business, and retain ownership through the' new value exception encourages debtors to attempt Chapter 11 reorganization instead of simply liquidating their assets and starting over.
 

 Second, we believe that if the new value exception’s requirements are properly applied, creditors’ interests will generally be benefited as well. The strictures of the new value doctrine provide creditors with significant safeguards against collusion between the proponent of the reorganization plan and the old equity owners.
 
 [38]
 
 Although the new value exception has been criticized as a subversion of the absolute priority rule, its requirements actually enhance the rule. As we noted earlier, they constitute guidelines by which a court can ensure that old equity will
 
 not
 
 acquire an interest in the reorganized debtor or other property
 
 on account of
 
 its old ownership interests. In fact, the new value exception puts limits on the power of old equity to gain an interest in the reorganized business beyond that provided in the explicit language of the Code. For example, there is nothing in the text of the Code that prevents stockholders from obtaining property in the reorganized debtor in exchange for contributions of labor; such a transaction would not give old equity any property “on account of’ its prior ownership interests. Yet the requirements of the new value exception prohibit this type of transaction.
 
 See Norwest Bank Worthington v. Ahlers,
 
 485 U.S. 197, 204-06, 108 S.Ct. 963, 967-69, 99
 
 *917
 
 L.Ed.2d 169 (1988) (contributions must be money or money’s worth).
 
 [39]
 

 As long as courts carefully apply the new value exception, it will not operate as a mechanism by which old equity can escape the requirements of the absolute priority rule. If a plan meets all the requirements of the new exception, it may be confirmed in a cramdown, assuming all other conditions for confirmation are present. Within the confines of the Code, bankruptcy courts are courts of equity.
 
 Ahlers,
 
 486 U.S. at 206,108 S.Ct. at 968. Properly applied, the new value exception allows bankruptcy courts to fulfill their assigned role of balancing the interests of debtors, creditors, old owners, and the public, guided by the overriding goal of ensuring the success of the reorganization.
 
 See Pioneer Inv. Serv. v. Brunswick Assoc.,
 
 — U.S. -, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993).
 

 Thus, our conclusion that nothing in the Bankruptcy Code forbids the confirmation of plans that comply with the new value doctrine is entirely consistent with Congressional bankruptcy policy. Because our reading of the statute will not produce results demonstrably at odds with the intentions of its drafters, we must enforce the Code according to its terms.
 
 United States v. Ron Pair Enterp., Inc.,
 
 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1988). Therefore, Bonner’s Plan is not unconfirmable simply because it provides for a new value transaction.
 

 V.
 
 THE NEW VALUE EXCEPTION AND THE BANCORP’S MOTION FOR RELIEF FROM THE AUTOMATIC STAY
 

 As noted above, the precise issue posed by Bancorp’s motion for relief from stay is not whether Bonner’s plan will ultimately be confirmed under section 1129 but whether there is a reasonable possibility that it can be confirmed within a reasonable time. That is all that Bonner need show to defeat Ban-corp’s section 362(d)(2) motion.
 
 United Sav. Ass’n of Tex. v. Timbers of Inwood Forest Assoc., Ltd,,
 
 484 U.S. 365, 376, 108 S.Ct. 626, 633, 98 L.Ed.2d 740 (1988). It need not put forth evidence of the type it would be required to produce in a confirmation hearing.
 
 See John Hancock Mutual Life Ins. Co. v. Route 37 Business Park Assoc.,
 
 987 F.2d 154, 162 (3d Cir.1993).
 

 Bancorp correctly argues that if Bonner’s Plan cannot possibly satisfy all of the requirements of the new value exception it cannot be confirmed as a matter of law and relief from the stay must be granted. While it is true that in certain cases an appellate court can determine the feasibility of confirmation as a matter of law,
 
 see id.,
 
 because of the lack of a sufficient factual record we cannot do so here. The bankruptcy court never held a hearing on the feasibility of the confirmation of Bonner’s plan and the district court failed to reach the issue as well. On this record we cannot say as a matter of law that Bonner’s proposed Plan cannot satisfy all of the requirements of the new value exception.
 
 [40]
 
 A remand to the bankruptcy court is required to determine the feasibility of confirmation and whether, despite the survival of the new value exception, Bancorp’s motion for relief from the stay of the foreclosure sale of Bonner Mall should be granted.
 

 VI.
 
 CONCLUSION
 

 Viewed properly, “the new value exception” may be seen as a rule of construction, or a rule that serves to define the meaning of the absolute priority rule and determine when it has been satisfied. As such it is as pertinent today as it was under pre-Code bankruptcy practice. The arguments that
 
 *918
 
 Bancorp advances do not persuade us that Congress would have had any reason to disregard a beneficial rule of construction that assists courts in implementing an important bankruptcy doctrine at the very time it was incorporating that doctrine into the Bankruptcy Code.
 

 Nothing in the text of the Code prohibits the confirmation of plans that properly employ the new value doctrine. Nor does the legislative history demonstrate that Congress intended to abrogate this judicially created, pre-Code legal principle. Therefore, we conclude that the new value “exception”, with its stringent requirements, survives. We recognize that, if applied carelessly, the doctrine has the potential to subvert the interests of creditors and allow debtors and old equity to abuse the reorganization process. The proper answer to these concerns is vigilance on the part of bankruptcy courts in ensuring that all of the requirements of the new value exception are met in every case. Here, it is unclear whether Bonner’s plan can meet all of the requirements of the doctrine and achieve confirmation. Nevertheless, it may well be within the realm of potentially con-firmable plans and thereby survive Bancorp’s motion for relief from the automatic stay. The bankruptcy court must make that determination initially.
 

 The judgment of the district court is AFFIRMED and the case is REMANDED to the bankruptcy court for further proceedings consistent with this opinion.
 

 [1]
 

 . We place quotation marks around the term "exception" because the label is a misnomer that has lead to significant confusion. However, due to the term’s common usage, we shall employ it on some occasions. On others we shall use the more descriptive new value "doctrine” or "principle".
 

 [2]
 

 . Bancorp also moved to dismiss the bankruptcy as a bad-faith filing. This motion was denied and no appeal has been taken.
 

 [3]
 

 . The bankruptcy court found that this was shown.
 

 [4]
 

 . In a § 362(d) proceeding the debtor need not demonstrate that its plan actually will be confirmed nor need it put forth the kind of evidence required at a confirmation hearing.
 
 See John Hancock Mut. Life Ins. Co.
 
 v.
 
 Route 37 Business Park Assoc.,
 
 987 F.2d 154, 162 (3d Cir.1993). A debtor must, however, produce some evidence that its plan could be confirmed by a reasonable bankruptcy judge.
 

 [5]
 

 .On petition for rehearing and after the Supreme Court’s decision in
 
 Dewsnup,
 
 the majority of the
 
 Greystone
 
 panel deleted the entire new value exception discussion over Judge Edith Jones’ vigorous dissent.
 
 See
 
 995 F.2d at 1285. The majority stated that it was expressing "no view whatever” on the new value exception.
 
 Id.
 

 [6]
 

 . For the reasons set forth in section V
 
 infra,
 
 we do not reach the question whether Bonner’s plan can satisfy the requirements of the exception.
 

 [7]
 

 . The bankruptcy court had jurisdiction over Bancorp's motion under 28 U.S.C. §§ 157(b)(1) & (b)(2)(G). Therefore, the district court’s appellate jurisdiction was properly invoked.
 

 [8]
 

 . In his order granting Bonner a stay from his order lifting the automatic stay, the bankruptcy judge referred to his earlier action as interlocutory. That description is incorrect.
 

 [9]
 

 . One noted commentator has described circuit law regarding the finality of intermediate level decisions in bankruptcy proceedings as "hopelessly unresolved.” 1
 
 Collier on Bankruptcy,
 
 ¶ 3.03[6][b], 3-192 (Lawrence King, ed. 15th ed. 1992). The Third Circuit takes the view that where the bankruptcy court has issued an indisputably final order a district court decision affirming or reversing is also final because there is nothing further for the district court to do.
 
 Official Unsecured Creditors Committee v. Michaels (In re Marin Motor Oil),
 
 689 F.2d 445, 448-49 (3d Cir.1982), ce
 
 rt. denied,
 
 459 U.S. 1207, 103 S.Ct. 1196, 75 L.Ed.2d 440 (1983). Other circuits adhere to a rule that a district court decision reversing and remanding is not final where the bankruptcy court will conduct significant further proceedings.
 
 E.g., In re G.S.F. Corp.,
 
 938 F.2d 1467, 1472 (1st Cir.1991);
 
 Suburban Bank of Cary Grove
 
 v.
 
 Riggsby (In re Riggsby),
 
 745 F.2d 1153, 1155 (7th Cir.1984);
 
 Homa v. Stone (In re Commercial Contractors, Inc.),
 
 771 F.2d 1373, 1375 (10th Cir.1985). As discussed
 
 infra
 
 we have charted a middle-course between these positions.
 

 [10]
 

 .One of the reasons for this distinction is that by definition the decisions we review under § 158(d) are those of another court (whether a district court or a bankruptcy appellate panel) acting in an appellate capacity. In most situations a decision we review under § 1291 is that of a district court (or jury) sitting
 
 nisi prius
 
 as the factfinder. The rules of finality are designed, in part, to preserve the integrity of the factfind-ing process. This interest is not at stake in the case of an intermediate level decision in a bank
 
 *904
 
 ruptcy proceeding. We review
 
 de novo
 
 all decisions of bankruptcy appellate panels and district courts in cases that come to us by way of § 158(d).
 
 See Briggs v. Kent (In re Professional Inv. Properties of Am.),
 
 955 F.2d 623, 626 (9th Cir.),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 63, 121 L.Ed.2d 31 (1992).
 

 [11]
 

 . In
 
 Vylene
 
 we raised the possibility that our decisions which hold that the finality requirements of § 1291 in the bankruptcy context are
 
 more stringent
 
 than those imposed by § 158(d) might be inconsistent with the "implications" of
 
 Connecticut Nat. Bank
 
 v.
 
 Germain,
 
 — U.S. -, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992)).
 
 See
 
 968 F.2d at 891-94. We need not address that question here except to note that nothing in
 
 Germain
 
 casts doubt upon the liberal standard for finality we have adopted regarding § 158(d).
 

 [12]
 

 . We have also considered whether delaying review might cause irreparable harm to a substantive right of the party that lost in the district court.
 
 E.g., Vylene,
 
 968 F.2d at 895-96. Delayed review in this case, however, would not cause irreparable harm to Bancorp; it would face only the prospect of unnecessarily litigating the merits of Bonner’s reorganization plan in the bankruptcy court.
 
 See Frontier Properties,
 
 979 F.2d at 1363 (impact upon litigation strategy and necessity of additional litigation are not irreparable harms).
 

 [13]
 

 .In
 
 Stanton
 
 we imprecisely used the word “would” rather than "could” in the foregoing clause and thereby implied that we should assert jurisdiction under this exception only if we knew that our decision on the merits would obviate the need for further factfinding. Ordinarily, we must resolve the question of our jurisdiction before determining the merits of a case. Therefore, the
 
 Stanton
 
 suggestion applies where a decision in favor of one of the parties as to a central legal issue in the case would eliminate the necessity of factual findings on remand, regardless of our eventual ruling.
 

 [14]
 

 . Thus, Bancorp would receive less than ten cents on the dollar in preferred stock for its unsecured claim.
 

 [15]
 

 . Bancorp questions whether this is a binding obligation under the terms of the plan.
 

 [16]
 

 . Bonner claims the property’s fair market value is $4.5 million, with equity of approximately $2 million. These figures are disputed. Ban-corp states that the property is the subject of a state court foreclosure proceeding.
 

 [17]
 

 .A class is deemed to have accepted a plan if at least two-thirds in amount and more than one-half in number of claims in the class vote to accept it. § 1126(c). A class is impaired if the plan does not provide it with full payment
 
 in cash
 
 of its claims on the date the plan becomes effective. § 1124(3)(A).
 

 [18]
 

 . "Our decision today should not be taken as any comment on the continuing vitality of the
 
 Ins Angeles Lumber
 
 exception.”
 
 Norwest Bank v. Ahlers,
 
 485 U.S. at 203 n. 3, 108 S.Ct. at 967 n. 3. The Solicitor General had filed an amicus brief asking the Court to rule that the new value exception was defunct.
 
 Id.
 

 [19]
 

 . Prior to
 
 Ahlers
 
 the Sixth and Seventh Circuits both applied the new value exception in confirming reorganization plans in cases arising under the Code.
 
 Teamsters Nat. Freight Indus. Negotiating Comm.
 
 v.
 
 U.S. Truck Co. (In re U.S. Truck Co.),
 
 800 F.2d 581, 588 (6th Cir.1986);
 
 Official Creditors’ Comm. ex rel. Class 8 Unsecured Creditors v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.),
 
 781 F.2d 99, 101 (7th Cir.1986). These opinions appear to have assumed the vitality of the doctrine without explicitly addressing the issue. While the Seventh Circuit’s later jurisprudence in this area is confused (see infra), the Sixth Circuit has never questioned the viability of
 
 U.S. Truck.
 
 Indeed, bankruptcy courts of the Sixth Circuit have adhered to
 
 U.S. Truck
 
 as controlling precedent since
 
 Ahlers. See e.g., In re Montgomery Court Apartments, Ltd.,
 
 141 B.R. 324, 343 (Bankr.S.D.Ohio 1992);
 
 In re Professional Dev. Corp.,
 
 133 B.R. 425, 428 (Bankr.W.D.Tenn.1991).
 

 [20]
 

 .
 
 E.g., Unruh v. Rushville State Bank of Rushville, Mo.,
 
 987 F.2d 1506 (10th Cir.1993);
 
 Anderson v. Farm Credit Bank of St. Paul (In re Anderson),
 
 913 F.2d 530 (8th Cir.1990).
 

 [21]
 

 .
 
 See In re Stegall,
 
 865 F.2d 140, 141-44 (7th Cir.1989);
 
 Kham & Nate's Shoes No. 2, Inc.
 
 v.
 
 First Bank of Whiting,
 
 908 F.2d 1351, 1359-62 (7th Cir.1990);
 
 Snyder v. Farm Credit Bank of St. Louis (In re Snyder),
 
 967 F.2d 1126, 1128 (7th Cir.1992).
 

 [22]
 

 .
 
 Travelers Ins. Co.
 
 v.
 
 Bryson Properties, XVIII, (In re Bryson Properties, Inc., XVIII),
 
 961 F.2d 496, 503-05 (4th Cir.),
 
 cert. denied,
 
 — U.S. -, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992).
 

 [23]
 

 . Professor Warren has stated:
 

 The Code does not prohibit old equity from becoming a post-petition Bnancer of the business or a post-plan owner of the business. The Code leaves old equity in the same position as any other potential investor: it may offer to buy any of the assets of the estate on the same terms as any other buyer.
 

 A Theory of Absolute Priority
 
 at 39.
 
 Accord
 
 Raymond T. Nimmer,
 
 Negotiating Bankruptcy Reorganization Plans: Absolute Priority and New Value Contributions,
 
 36 Emory L.J. 1009, 1051 (1987); Bruce A. Markell,
 
 Owners, Auctions and Absolute Priority in Bankruptcy Reorganizations,
 
 44 Stan.L.Rev. 69, 96-102 (1991).
 

 [24]
 

 . For example, section 1129 alone uses a variant of the "on account of such claim or interest” language seven times.
 

 [25]
 

 . We agree with the
 
 Woodscape
 
 court that a textual search for a “new value exception” to the absolute priority rule dictates its own negative result because such a statutory exception does not exist. 134 B.R. at 173. As we have explained, the new value principle is an extra-statutory doctrine that specifically regulates the conditions under which plans calling for an infusion of capital by old equity in exchange for participation in the reorganized debtor may be confirmed in a cramdown.
 
 See also F.A.B.,
 
 147 B.R. at 768-69 (quoting amicus brief submitted by Professor Elizabeth Warren). A qualifying new value plan simply does not violate the absolute priority rule.
 

 [26]
 

 . In
 
 Bryson
 
 the Fourth Circuit seemed to find the fact that the debtor has the exclusive right to file a plan within 120 days of the order allowing it to proceed under Chapter 11 relevant to the validity of the plan under consideration.
 
 Id.
 
 at 504. The debtor receives this exclusive opportunity, which may be enlarged or shortened by the bankruptcy judge upon notice for cause, by operation of law. 11 U.S.C. § 1121 (b) — (c). We do not believe that this exclusivity period, which did not exist under the Act, makes the new value exception objectionable under the Code. Any party in interest may file a plan 1) if the debtor has not done so within the 120 days; 2) or if that plan is not accepted within 180 days of the order for relief under Chapter 11. 11 U.S.C. § 1121(c). Any proposed reorganization plan may take advantage of the new value principle. Moreover, in this case Bonner filed its plan after the exclusivity period had expired. Therefore, Bancorp had the ability to propose a competing plan if it so desired.
 

 [27]
 

 . The definition of "property” under the Code is extremely broad and includes intangible property.
 
 Ahlers,
 
 485 U.S. at 208, 108 S.Ct. at 969. However, the exclusivity of the opportunity to purchase stock is irrelevant. Even if specified creditors and outside investors were given the opportunity to purchase stock for new value as well, old equity would still be given something of value which may be described as "property". A stock purchase option is property whether or not other people are also given such an option.
 
 See Kham & Nate’s Shoes,
 
 908 F.2d at 1360.
 

 [28]
 

 . In theory, a reorganization plan could give the exclusive opportunity to receive stock in exchange for a new value contribution to anybody. For reasons that may sometimes be valid and sometimes not it will usually be the old owners.
 

 [29]
 

 . This situation may occur with greater frequency in cases, such as the present one, involving single asset commercial real estate bankruptcies. In many parts of the country a depressed commercial real estate market will make these investments unattractive.
 

 [30]
 

 .
 
 Case
 
 v.
 
 Los Angeles Lumber
 
 does not require that old equity be the only source of new capital for its contribution to meet this test; it is enough that the prior stockholders be the "most feasible source of the new capital."
 
 See
 
 308 U.S. at 121 n. 15, 60 S.Ct. at 10 n. 15 (internal quotation omitted).
 

 [31]
 

 . Bancorp argues that the
 
 Midlantic/Kelly
 
 rule of construction set forth above applies only where there is a conflict between bankruptcy law and non-bankruptcy law. While there is language in
 
 United States v. Ron Pair Enterp., Inc., 489 U.S. 235, 245, 109 S.Ct. 1026, 1033, 103
 
 L.Ed.2d 290 (1988), supporting such a narrow view of those cases, the later
 
 Davenport
 
 case gives a broader reading to the
 
 Midlantic/Kelly
 
 principle.
 
 Davenport
 
 applied the principle where there was no conflict with non-bankruptcy law.
 
 Dewsnup,
 
 an even later case, is consistent with
 
 Davenport’s
 
 approach.
 

 [32]
 

 . The term "fair and equitable” originated in the field of equity receivership reorganizations.
 
 Case
 
 v.
 
 Los Angeles Lumber, 308 U.S.
 
 at 115, 60 S.Ct. at 6. The phrase was first codified in 1934 as section 77B(f)(l) of the Bankruptcy Act but given no statutory definition. Section 77B was repealed and replaced by Chapter X of the Bankruptcy Act in 1938.
 

 [33]
 

 . One example of a well-established component of "fair and equitable” that was not included was the concept that no senior class is to receive more than 100 percent of the amount of its claims. For a discussion of the uncodified aspects of the "fair and equitable” principle under the Bankruptcy Code, see Kenneth N. Klee,
 
 Cram Down II
 
 64 Am.Bankr.L.J. 229 (1990).
 

 [34]
 

 . For example, Chapter X had an absolute priority rule; Chapter XI did not. Trustees were mandatory in Chapter X cases; the debtor retained control under Chapter XI.
 

 [35]
 

 . Creditors are given guarantees as
 
 individual creditors
 
 under the best interests test. 11 U.S.C. § 1129(a)(7).
 

 [36]
 

 .
 
 For example, a Chapter 11 plan cannot be confirmed unless the court finds that creditors will receive under it at least as much as they would in a liquidation. § 1129(a)(7).
 

 [37]
 

 . From one perspective, the debate over the survival of the new value exception is a division between those who perceive the paramount objective of Chapter 11 to be successful reorganization of the debtor and those who believe it should be protection of creditors’ interests.
 

 [38]
 

 .If old equity contributes a substantial amount of new capital to the business undergoing reorganization, then the risk of a later failure falls more heavily on stockholders than creditors.
 
 See Nimmer, supra
 
 note 23, at 1050-52, 1072-73.
 

 [39]
 

 .
 
 See also In re Stegall,
 
 865 F.2d 140, 142-44 (7th Cir.1990) (the contribution of one hundred pigs among other farm related items of unknown value does not satisfy the new value exception).
 

 [40]
 

 . Courts and commentators have noted certain conceptual difficulties regarding valuation inherent in the application of the new value exception.
 
 E.g., In re Bjolmes Realty Trust,
 
 134 B.R. 1000, 1008-10 (Bankr.D.Mass.1991); Markell,
 
 supra
 
 note 23, at 119-21. While we are aware that valuation can be complicated and uncertain in this context, as well as in bankruptcy generally,
 
 see, e.g., Official Creditors’ Comm. ex rel. Class 8 Unsecured Creditors v. Potter Material Serv., Inc. (In re Potter Material Serv., Inc.),
 
 781 F.2d 99, 104 (7th Cir.1986);
 
 Nimmer, supra
 
 note 23 at 1044, we shall not address valuation methodology at this juncture. We believe the better course is to explore this issue at a later date, in the context of a concrete factual situation.