**In re Ricardo VICTORIO and Jenny Victorio, Debtors.**

**No. 10–07125–LT13.**

United States Bankruptcy Court, S.D. California.

July 8, 2011.

John C. Colwell, Law Offices of John C. Colwell, a P.L.C., Bonita, CA, for Debtors.

Thomas H. Billingslea Jr., Esq., San Diego, Chapter 13 Trustee.

## ORDER ON CHAPTER 13 TRUSTEE'S OBJECTION TO CONFIRMATION

PETER W. BOWIE, Chief Judge.

The Victorios filed a joint Chapter 7 petition on or about October 31, 2007. They listed their house as valued at $455,000, with $448,000 in consensual liens on it. Indymac was scheduled as having the senior lien, of $359,909, and CitiMortgage was listed in junior position at $89,083. The case proceeded routinely, and debtors received their Chapter 7 discharge on or about February 8, 2008.

More than two years later, the Victorios filed again, this time under Chapter 13. Their petition, filed April 28, 2010, declared that their home was now worth $213,500, while after more than two years having passed they still owed the identical amounts to Indymac and CitiMortgage as they had listed in October, 2007. In addition, they had accrued $2,212.91 in unpaid real property taxes, and their proposed plan indicated they had accrued $7,969 in arrears to Indymac between filings.

Because of their earlier Chapter 7 discharge, debtors listed a number of unsecured creditors for "Notice Only", except for three. One debt, scheduled as having been incurred in July, 2009 was for $3,598 to WAMU's collection agent. The second was incurred in August, 2009, also to WAMU and its agent. The third was a debt of their daughter for $402, on which they cosigned, and was owed to United Consumer Financial.

Central to the multi-phased, and lengthy discussion which follows, is the Victorios' proposal to strip off the junior lien of CitiMortgage on their home on the theory that there was no equity to which its lien could attach, all as set out in paragraph 19 of their proposed plan. In addition, debtors propose to pay 100% of unsecured claims.

The Chapter 13 trustee promptly objected to confirmation, including as a ground for objection that debtors were not eligible for a discharge so any interim lien strip would be illusory. The trustee recognized that "[d]ismissal results in reinstatement of voided lien under Section 349(b)." The trustee cited to a then-recently published decision of this Court on a relief from stay motion in a Chapter 13 case that had followed on the heels of a Chapter 7 discharge.

The debtors responded to the trustee's objection, stating:

Debtors can infer from the reading of the preliminary stay relief decision by this Court in the *Casey* case that the Trustee is disavowing any knowledge of the "4th option". Debtors suggest that the ruling of *In re Leavitt*, 171 F.3d 1219 (9th Cir.1999), is distinguishable and now not applicable, as it relates to the finding that "A Chapter 13 case concludes in one of three ways" *Leavitt* at 1223, after the application of the "new" law as of 10/17/2005. The 4th option of administrative closing of the Ch. 13 case clearly exists and is used extensively by the Court itself, since the "new" law was enacted.

The Court invited the parties to submit supplemental briefing, which they have done.

The Chapter 13 trustee filed first, and makes a number of arguments. The trustee asserts that the unsecured lien creditor has an *in rem* claim which it retains throughout the case because "the lien strip is complete only upon discharge." Because of that legal fact, failure to make significant payments to that creditor results in "undue delay". The trustee argues that upon completion of a no-discharge Chapter 13 plan the case ought to be "administratively dismissed", thereby invoking 11 U.S.C. § 349 and reinstating the lien on the property.

Debtors respond by asserting—without citation to any authority—"Bankruptcy cases that are ineligible for discharge have always been permitted to administratively close without dismissal." They also assert that because they believe the value of the creditor's claim is $0 on a secured claim, there is no undue delay. Debtors press their argument for the so-called "4th option" of administrative closing by asserting that other amendments to the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) contemplate a case ending without a discharge if, for example, a debtor fails to obtain a certificate of completion of a financial management course, 11 U.S.C. § 727(a)(11). That statute is silent regarding closing the case, and it is an amendment to Rule 4006, enacted by the Judicial Conference in 2008 that mentions "closing the case without the entry of a discharge".

After receiving the supplemental briefing from both sides, the Court took the matter under submission. The issues raised by both are important ones and, as discussed later, have been the subject of careful consideration by courts all over the country, albeit without unanimity of views.

As will be set out more extensively, this Court finds and concludes that debtors in a Chapter 20 case cannot obtain a "permanent" avoidance of a wholly unsecured junior lien on their principal residence unless they pay the claim amount in full, or obtain a discharge. Because the Victorios' Plan does not contemplate paying the junior lien creditor at all, and because if they did so intend, they could not do so with the present plan over the maximum term allowed for a Chapter 13, the objection of the Chapter 13 trustee is sustained.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

*Background*

The severe economic downturn over the past several years has brought out a number of issues, including the ones raised by the trustee and the debtors. It has also prompted resulting strategies of debtors in various parts of the United States where the bubble of the housing market has burst, including the Southern District of California. Lenders on properties which once provided substantial security for loans made against equity in the real estate have discovered that the tide of high values which formerly was in, has receded. While the tide was in, owners borrowed against that high value. Now that it has gone out, the junior lenders have discovered that the loans they made are no longer secured by value in the property. Moreover, in many instances, even a substantial part of the value securing the senior liens has been carried off by the receding tide.

During the Presidential election cycle of 2008, debates included consideration of ways in which home mortgages might be modified to reflect the changes in market value, with one goal of trying to keep

families in homes at a price they might be able to maintain. The hows, whys, and why nots are not relevant to this opinion. Ultimately, the country's leaders chose to attempt to address the complicated problems in other ways. In the meantime, however, experienced bankruptcy practitioners recognized that the Bankruptcy Code provided certain tools debtors might invoke to attempt to address at least junior liens on primary residences that had become wholly unsecured by any value in the subject property after recognizing that the debt owed to the senior lender exceeded the value of the property. Among those tools is 11 U.S.C. § 1322(b)(2), which provides that a Chapter 13 plan may:

(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence. . . .

See also 11 U.S.C. § 1123(b)(5), to the same effect in Chapter 11 cases.

In 1997 the Ninth Circuit Bankruptcy Appellate Panel handed down its seminal decision in *In re Lam*, 211 B.R. 36, in which the panel held that the prohibition against modification of a loan secured by an interest in a debtor's principal residence, as set out in § 1322(b)(2) does not apply if there is no value to which the security interest could attach because already fully subsumed by the security interest of a senior lienholder. *Lam* was followed in 2002 by *In re Zimmer*, 313 F.3d 1220, decided by a panel of the Ninth Circuit Court of Appeals.

Within the universe of Chapter 13 cases that propose to strip off junior liens on homes that are principal residences, there is a subset of cases that have become known as "Chapter 20" cases. That is, the Chapter 13 case was preceded by a Chapter 7 case, and that Chapter 7 resulted in discharge of the debtor's personal liability on the underlying obligation. *Johnson v.*

*Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). *Johnson* is recognized for its holding that even though a debtor has discharged his or her personal liability on the obligation on a mortgage in a Chapter 7 case, the debtor may still file a Chapter 13 case to address the lender's claim against the debtor's real property because "the Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy." 501 U.S. at 83, 111 S.Ct. 2150. Under *Johnson*, the fact that a debtor had already obtained a Chapter 7 discharge of his or her personal liability on the same debt did not preclude the debtor from filing a sequential Chapter 13 case to obtain a discharge through performance of a confirmed plan in the Chapter 13. At the time *Johnson* was decided, there was no statutory prohibition of a Chapter 13 discharge on the heels of one under Chapter 7.

Then, in 2005 Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act. One of the provisions of that Act is 11 U.S.C. § 1328(f), which provides in relevant part:

(F) Notwithstanding subsections (a) and (b), the court shall not grant a discharge of all debts provided for in the plan or disallowed under section 502, if the debtor has received a discharge—

(1) in a case filed under chapter 7, 11, or 12 of this title during the 4–year period preceding the date of the order for relief under this chapter; . . . .

Recognition of the foregoing parameters of bankruptcy relief has led to some very creative lawyering on behalf of debtors, culminating in the syllogistic argument that: a) debtor discharged his or her personal liability on the promissory note for the loan secured by a lien on the debtor's real property in the preceding Chapter 7 case; b) debtor is not precluded from filing

a Chapter 13 within four years of the Chapter 7 discharge—the debtor just is ineligible for the Chapter 13 discharge; c) if the debtor can file a Chapter 13 even though ineligible for a discharge, the debtor can avail himself of the lien strip-off allowed by § 1322(b)(2); d) if the lien can be stripped off in the Chapter 13, the lender cannot enforce the lien against the real property to collect on the underlying debt; and e) the lender cannot enforce the now-unsecured debt against the debtor personally because the debtor's personal liability on it was discharged in the preceding Chapter 7. Under that argument, the lender would wind up holding an empty bag, without recourse either to the property or to the debtor personally, on what was once a consensual loan of money secured by a junior lien on debtor's residence. The challenge for this and other courts is to determine whether the syllogism withstands careful scrutiny.

The Supreme Court, in *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), began its efforts to find Congress' intent regarding lien stripping by looking at established bankruptcy principles as they existed prior to adoption of the Bankruptcy Code in 1978. The Court did so in its effort to understand what Congress meant in 11 U.S.C. § 506(d) in its use of the phrase "allowed secured claim." The majority opinion is shaky in its conviction, as illustrated by the following passage:

We conclude that respondents alternate position ..., although not without its difficulty, generally is the better of the several approaches. Therefore, we hold that § 506(d) does not allow petitioner to "strip down" respondents' lien, because respondents' claim is secured by a lien and has been fully allowed pursuant to § 502. Were we writing on a clean slate, we might be inclined to agree with petitioner that the words "allowed secured claim" must take the

same meaning in § 506(d) as in § 506(a). But, given the ambiguity in the text, we are not convinced that Congress intended to depart from the pre-Code rule that liens pass through bankruptcy unaffected.

502 U.S. at 417, 112 S.Ct. 773.

In support of its conclusion, the Court noted that the Bankruptcy Act of 1898 expressly provided:

Liens given or accepted in good faith and not in contemplation of or in fraud upon this Act, and for a present consideration, which have been recorded according to law ... shall not be affected by this Act.

502 U.S. at 418, Fn.4, 112 S.Ct. 773. In the same footnote, the Court explained that the principle remained in force despite not having been expressly set out in the Chandler Act of 1938. *Id.*

Then the *Dewsnup* Court turned to a brief review of two of its prior decisions on the subject of lien stripping—as the Court put it, "involuntary redirection of the amount of a creditor's lien for any reason other than payment on the debt." 502 U.S. at 419, 112 S.Ct. 773. The first case reviewed was *Long v. Bullard*, 117 U.S. 617, 6 S.Ct. 917, 29 L.Ed. 1004 (1886), where "the Court held that a discharge in bankruptcy does not release real estate of the debtor from the lien of a mortgage created by him before the bankruptcy." 502 U.S. at 419, 112 S.Ct. 773.

The second case reviewed by the *Dewsnup* Court warrants more thorough discussion. It is *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). The Radfords borrowed money from the Land Bank on two occasions and gave the Bank mortgages securing the loans by liens on their farm land. After the Radfords defaulted, the Bank filed suit to foreclose. The Radfords responded with their own

federal action to seek a composition of their debts. While that was pending, Congress passed the Frazier–Lemke Act in June, 1934, which amended the bankruptcy laws to provide certain forms of relief to farmers who were at risk of losing their farms because of the Depression.

In essence, the new law provided that if a farmer could not obtain sufficient consents from creditors for a composition, the debtor could purchase the property at its appraised value with payments spread out over six years at a prescribed rate, with most of the debt payable in year six. That process required the lender's consent. If the lender refused consent, the debtor could ask the court to stay the proceedings for five years, during which the debtor could continue to occupy and work the property at an annual rent set for the amount of the property the debtor retained. The debtor would have up to five years to pay into court funds equal to the appraised value of the property the debtor retained. If the debtor did so, the Act directed that the debtor would receive clear title to the property he kept, and the debtor could apply for a discharge. The Bank challenged the constitutionality of the legislation, in particular because the Act was expressly to apply only to debts that were in existence on the date of enactment.

The *Radford* Court tipped its hand somewhat when it quoted from a then-recent decision concerning state law provisions impacting mortgages:

> There we said: "With studied indifference to the interests of the mortgagee or to his appropriate protection they have taken from the mortgage the quality of an acceptable investment for a rational investor," and, "So viewed they are seen to be an oppressive and unnecessary destruction of nearly all the incidents

that give attractiveness and value to collateral security."
295 U.S. at 578, 55 S.Ct. 854.

The *Radford* Court then reviewed the history of mortgages as reflected in adjustments to the correlative—and shifting—rights of mortgagees and mortgagors. After noting that over time mortgagors were "given a reasonable time to cure the default", the Court stated:

> But the statutory command that the mortgagor should not lose his property on default had always rested on the assumption that the mortgagee would be compensated for the default by a later payment, with interest, of the debt for which the security was given; and the protection afforded the mortgagor was, in effect, the granting of a stay. No instance has been found, except under the Frazier–Lemke Act (11 USCA § 203(s)) of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full.

295 U.S. at 579, 55 S.Ct. 854. In concluding its review of the history of mortgages, the Court observed:

> This right of the mortgagee to insist upon full payment before giving up his security has been deemed of the essence of a mortgage.... To protect his right to full payment or the mortgaged property, the mortgagee was allowed to bid at the judicial sale on foreclosure. In many states other statutory changes were made in the form and detail of foreclosure and redemption. But practically always the measures adopted for the mortgagor's relief, including moratorium legislation enacted by the several states during the present depression, resulted primarily in a stay; and the relief afforded rested, as theretofore, upon the assumption that no substantive right of the mortgagee was being impaired, since

payment in full of the debt with interest would fully compensate him.

295 U.S. at 580–81, 55 S.Ct. 854.

The Radford Court then turned its attention to a review of prior bankruptcy legislation. It noted:

> Although each of our national bankruptcy acts followed a major or minor depression, none had prior to the Frazier–Lemke amendment, sought to compel the holder of a mortgage to surrender to the bankrupt either the possession of the mortgaged property or the title, so long as any part of the debt thereby secured remained unpaid. . . . But unless the mortgagee released his security, in order to prove in bankruptcy for the full amount of the debt, a mortgage even of exempt property was not disturbed by bankruptcy proceedings.

295 U.S. at 581–83, 55 S.Ct. 854.

It is interesting to contemplate the Radford Court's setting of the table, as it were. After all the foregoing discussion, the Court stated:

> It is true that the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none; and that the Frazier–Lemke Act (11 USCA s 203(s)) is the first instance of an attempt, by a bankruptcy act, to abridge, solely in the interest of the mortgagor, a substantive right of the mortgagee in specific property held as security.

295 U.S. at 588–89, 55 S.Ct. 854. But then the Court says:

> But we have no occasion to decide in this case whether the bankruptcy clause confers upon Congress generally the power to abridge the mortgagee's rights in specific property.

*Id.* Why? Because the Frazier–Lemke amendment expressly applied only to mortgages already existing at the time of its enactment. That provision evoked the Fifth Amendment to the Constitution, which prohibits the taking of property of another without just compensation. The Court reviewed the multiple rights afforded a mortgagee under applicable state law, all of which arose from the mortgage agreement entered into prior to enactment of the Frazier–Lemke amendment to the bankruptcy laws. The Court observed about the amendment:

> Its avowed object is to take from the mortgagee rights in the specific property held as security; and to that end "to scale down the indebtedness" to the present value of the property.

295 U.S. at 594, 55 S.Ct. 854. It is of more than passing interest that the Court noted that as passed by the House Frazier–Lemke would have applied to future mortgages as well as existing ones, but the Senate forced the limitation to existing mortgages, only, because "if made applicable to future mortgages, [it] would destroy the farmer's future mortgage credit." 295 U.S. at 595, 55 S.Ct. 854.

As already alluded to, the Radford Court, while having engaged in a wide-ranging discussion of issues, returned to the specific issue before it:

> The province of the Court is limited to deciding whether the Frazier–Lemke Act (11 USCA s 203(s)) as applied has taken from the bank without compensation, and given to Radford, rights in specific property which are of substantial value. . . . As we conclude that the act as applied has done so, we must hold it void; for the Fifth Amendment commands that, however great the nation's need, private property shall not be thus taken even for a wholly public use without just compensation. If the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be

had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

295 U.S. at 601–02, 55 S.Ct. 854.

At the same time the Court was acknowledging that the parameters of Frazier–Lemke were limited to mortgages existing as of its enactment—thus causing the Court to write:

But we have no occasion to decide in this case whether the bankruptcy clause confers upon Congress generally the power to abridge the mortgagee's rights in specific property

(295 U.S. at 589, 55 S.Ct. 854), the Court also pondered:

The power over property pledged as security after the date of the act may be greater than over property pledged before. . . .

*Id.*

Because the United States was deep in the throes of the Depression, Congress responded quickly to the *Radford* decision. In 1935, Congress amended the Frazier–Lemke Act to try to establish a different procedure that would afford relief to farmers at risk of losing their farms. In *Wright v. Vinton Branch of Mountain Trust Bank,* 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937) Justice Brandeis (who also authored *Radford* ) explained that Wright had granted the bank a mortgage in 1929, which had matured and was in default, and the trustee under the deed of trust had advertised the intended sale of the farm. Wright filed a bankruptcy petition in 1935, asked for a stay of the sale, and made a proposal for composition, which the bank did not accept. Then, on August 28, 1935 Congress amended Frazier–Lemke and Wright filed an amended petition, seeking relief under the new law. The bank moved to dismiss, challenging the constitutionality of the new law. That

motion was granted, and affirmed on appeal.

Justice Brandeis began his analysis by starting with the *Radford* decision. He wrote:

The decision in the Radford Case did not question the power of Congress to offer to distressed farmers the aid of a means of rehabilitation under the bankruptcy clause. The original Frazier–Lemke Act was there held invalid solely on the ground that the bankruptcy power of Congress, like its other great powers, is subject to the Fifth Amendment; and that, as applied to mortgages given before its enactment, the statute violated that Amendment, since it effected a substantial impairment of the mortgagee's security.

300 U.S. at 456–57, 57 S.Ct. 556. Justice Brandeis continued:

The [Radford] opinion enumerates five important substantive rights in specific property which had been taken. It was not held that the deprivation of any one of these rights would have rendered the Act invalid, but that the effect of the statute in its entirety was to deprive the mortgagee of his property without due process of law. The rights enumerated were [citation omitted]:

(1) The right to retain the lien until the indebtedness thereby secured is paid.

(2) The right to realize upon the security by a judicial public sale.

(3) The right to determine when such sale shall be held, subject only to the discretion of the court.

(4) The right to protect its interest in the property by bidding at such sale whenever held, and thus to assure having the mortgaged property devoted primarily to the satisfaction of the debt, either through receipt of the proceeds of a fair competitive sale or by taking the property itself.

(5) The right to control meanwhile the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

300 U.S. at 457.

Justice Brandeis wrote that Congress "sought to preserve to the mortgagee all of these rights" in redrafting Frazier–Lemke, so as to provide relief "free from the objectionable features which had been held fatal to the original Act." *Id.* He noted "that the new Act adequately preserves three of the five above enumerated rights of a mortgagee." *Id.* The Court recognized that the revised Act provided for retention of the lien "until the indebtedness thereby secured is paid", as well as the right to seek a public sale of the collateral. 300 U.S. at 458–59, 57 S.Ct. 556. In addition, the Court was satisfied that Congress intended the mortgagee could bid at any such sale.

According to Justice Brandeis, the bank's major argument was with the provision that a debtor who cleared certain procedural hurdles could ask for and receive a three year stay of all foreclosure proceedings against the subject property and that:

> "At the end of three years, or prior thereto, the debtor may pay into court, the amount of the appraisal of the property of which he retains possession, including the amount of encumbrances on his exemptions, up to the amount of the appraisal, less the amount paid on principal."

300 U.S. at 460, 57 S.Ct. 556. Curiously, instead of addressing the opportunity for the debtor to reduce the debt to the mortgagee to the appraised value of the property within the three year window, the court discussed: "[W]hile the Act affords the debtor, ordinarily, a three-year period of rehabilitation, the stay provided for is not an absolute one; and that the court may terminate the stay and order a sale earlier." 300 U.S. at 461, 57 S.Ct. 556. Much of the next several pages of the opinion is devoted to construing Congress' intent in the revisions to provide that "the property is virtually in the complete custody and control of the court, for all purposes of liquidation." 300 U.S. at 464, Fn. 9, 57 S.Ct. 556.

In summing up, the Court stated:

> The question which the objections raise is not whether the Act does more than modify remedial rights. It is whether the legislation modifies the secured creditor's rights, remedial or substantive, to such an extent as to deny the due process of law guaranteed by the Fifth Amendment.

300 U.S. at 470, 57 S.Ct. 556. The Court then stated: "A court of bankruptcy may affect the interests of lienholders in many ways." *Id.* After listing several, it concluded:

> It may enjoin like action by a mortgagee which would defeat the purpose of subsection (s) to effect rehabilitation of the farmer mortgagor. For the reasons stated, we are of opinion that the provisions of subsection (s) make no unreasonable modification of the mortgagee's rights; and hence are valid.

*Id.*

The lengthy preceding discussion is relevant to the overall discussion because in *Wright* the Supreme Court upheld as constitutional a bankruptcy statutory provision that afforded a farmer debtor who had proposed a composition in good faith, but who was unable to gain acceptance, a procedure to ask the court for a three year moratorium on foreclosure. During that three years, the debtor could be required to pay a court-ordered rent and, by the end of the three years the debtor could deposit with the court funds equal to the

appraised value of the property, and thereby obtain title to it. In essence, the revised Frazier–Lemke provision gave the debtor three years to redeem at the appraised value the subject real property, regardless of how much of the debt was unsecured by that valuation.

The very next year, the Supreme Court decided another case involving the amended Frazier–Lemke Act. The debtor was another Mr. Wright, unrelated to the one above. In *Wright v. Union Central Life Ins. Co.*, 304 U.S. 502, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938), the issue was whether foreclosed property reconveyed to debtor, after he had filed his petition but before the state law period of redemption had run, was brought into the estate such that the amended Frazier–Lemke provision could operate to extend the state law period of redemption. The Court found that Congress had the power to so provide "under the bankruptcy clause." 304 U.S. at 515, 58 S.Ct. 1025. After briefly reviewing ways in which Congress had validly done so in the past, the Court stated:

> The mortgage contract was made subject to constitutional power in the Congress to legislate on the subject of bankruptcies. Impliedly, this was written into the contract between petitioner and respondent. "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of the legal order."

304 U.S. at 516, 58 S.Ct. 1025. The Court concluded:

> Property rights do not gain any absolute inviolability in the bankruptcy court because created and protected by state law. Most property rights are so created and protected. But if Congress is acting within its bankruptcy power, it may authorize the bankruptcy court to affect these property rights, provided

the limitations of the due process clause are observed.

304 U.S. at 518, 58 S.Ct. 1025.

In 1940 the Supreme Court heard the sequel in *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184. There, Justice Douglas writing for the Court addressed the issue of whether the debtor must be accorded an opportunity to redeem at the appraised value "before the court could order a public sale." 311 U.S. at 276, 61 S.Ct. 196. The creditor had moved to either dismiss the proceedings or order a sale because the debtor had not complied with the court's order to deliver 40% of his crops to the trustee, had made no payment on the principal of the debt since 1925, and none on interest since 1930. The creditor argued there was no reasonable possibility of rehabilitation. Debtor countered with his request to have the land appraised, to give him an opportunity to redeem the property at that sum once it was set, "and to be discharged from liability on account of any deficiency." 311 U.S. at 276, 61 S.Ct. 196.

Justice Douglas wrote that while the Court recognized that granting a lienholder's request for a public sale was mandatory, so was granting the debtor's request for an appraisal and a reasonable period of time to redeem. To reconcile the seemingly conflicting provisions, the Court looked to "the purpose and function of the Act". Justice Douglas wrote:

> This Act provided a procedure to effectuate a broad program of rehabilitation of distressed farmers faced with the disaster of forced sales and an oppressive burden of debt. [Citations omitted.] Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. [Citations omitted.] There is no constitutional claim of the creditor to more than that. And so

long as that right is protected the creditor certainly is in no position to insist that doubts or ambiguities in the Act be resolved in its favor and against the debtor. Rather, the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress [citations omitted], lest its benefits be frittered away in narrow formalistic interpretations which disregard the spirit and the letter of the Act.

311 U.S. at 278–79, 61 S.Ct. 196.

The Court concluded:

We hold that the debtor's cross petition should have been granted; that he was entitled to have the property reappraised or the value fixed at a hearing; that the value having been determined at a hearing in conformity with his request, he was then entitled to have a reasonable time, fixed by the court, in which to redeem at that value; and that if he did so redeem, the land should be turned over to him free and clear of encumbrances and his discharge granted.

311 U.S. at 281, 61 S.Ct. 196.

This lengthy discussion started at *Dewsnup v. Timm*, 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992), to which it now returns. The central reason why the foregoing discussion was so detailed is because none of the three *Wright* cases are mentioned anywhere in *Dewsnup*—not in the majority opinion nor in the dissent. *Radford* was mentioned in the majority opinion, as noted, while the *Wright* cases— all decided after *Radford* and citing extensively to it—are nowhere mentioned.

Even more central to the discussion substantively is that the *Dewsnup* majority, in conjunction with citing to *Long v. Bullard* and *Radford*, and quoting from *Radford*, stated:

The Court invalidated that statute under the Takings Clause. It further observed: "No instance has been found, except under the Frazier–Lemke Act, of either a statute or decision compelling the mortgagee to relinquish the property to the mortgagor free of the lien unless the debt was paid in full."

502 U.S. at 419, 112 S.Ct. 773. Then the *Dewsnup* majority said:

Congress must have enacted the Code with a full understanding of this practice. [Citation omitted.]

When Congress amends the bankruptcy laws, it does not write "on a clean slate." [Citations omitted.] Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-code practice that is not the subject of at least some discussion in the legislative history. [Citations omitted.] Of course, where the language is unambiguous, silence in the legislative history cannot be controlling. But, given the ambiguity here, to attribute to Congress the intention to grant a debtor the broad new remedy against allowed claims to the extent that they become "unsecured" for purposes of § 506(a) without the new remedy's being mentioned somewhere in the Code itself or in the annals of Congress is not plausible, in our view, and is contrary to basic bankruptcy principles.

502 U.S. at 419–20, 112 S.Ct. 773. If there are reasons why the Court considered the strip-down provisions of § 506(a) and (d), of § 1322(b)(2), and of § 1123(b)(5) as not "being mentioned somewhere in the Code itself", or somehow irrelevant to the discussion, the Court does not tell us why. Nor does the Court tell us why the procedure and remedies of the amended Frazier–Lemke Act—after *Radford* was decided—did not constitute the practice Congress understood at the time of enacting the Bankruptcy Code. It

appears it was, and had been upheld as a constitutional exercise of Congress' bankruptcy clause power.

The *Dewsnup* court did recognize that *Dewsnup* involved a Chapter 7 debtor. The Court asserted:

> Apart from reorganization proceedings [citations omitted], *no* provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt.

502 U.S. at 318–19, 112 S.Ct. 719. But then the Court includes *Radford* in that discussion, presumably as a product of an unsuccessful effort at a consensual composition. To the extent the Court considered *Radford* analogous to a Chapter 7, with its five year redemption period, then it is even harder to understand why the *Wright* cases are not relevant with a three year redemption period. To the extent the Court is acknowledging, independent of how *Radford* is analogized, that in reorganization proceedings "involuntary reduction of the amount of a creditor's lien" was permissible, that may help to confine *Dewsnup* to Chapter 7 cases.

Earlier in its opinion, the Court stated that the reach of its decision was intended to be narrow. It wrote:

> Hypothetical applications that come to mind and those advanced at oral argument illustrate the difficulty of interpreting the statute in a single opinion that would apply to all possible fact situations. We therefore focus upon the case before us and allow other facts to await their legal resolution on another day.

502 U.S. at 416–17, 112 S.Ct. 773. And in footnote 3, the Court wrote: "Accordingly, we express no opinion as to whether the words 'allowed secured claim' have different meaning in other provisions of the Bankruptcy Code."

In theory, those statements support reading *Dewsnup* as applicable only to Chapter 7 cases. But that does not appear to be Congress' intent. Section 103 of Title 11, United States Code states Congress' intent clearly:

> (A) Except as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under Chapter 7, 11, 12, or 13 of this title....

Section 506(d) is part of Chapter 5 of Title 11 and under the provision of § 103(a) would clearly apply to cases under Chapters 7, 11, 12 and 13. But *Dewsnup* says it does not apply to Chapter 7 cases, and the Court ostensibly leaves for another day its applicability in other Chapters. That is the law that has been applicable in bankruptcy since *Dewsnup* was decided in 1992.

Recognizing that § 506 is part of Chapter 5 of the Bankruptcy Code, and was intended by Congress to be applicable to cases brought under Chapters 7, 11, 12 and 13 raises more issues in terms of how Congress intended to give effect to its provisions. It has been suggested that it is a stand-alone provision which grants the lien avoidance under § 506(a) and (d) when invoked. Section 349 of the Code, specifying the effect of dismissal of a case might seem to support that notion by the language of § 349(b)(1)(C), which states that dismissal "reinstates—(C) any lien voided under section 506(d) of this title;...." But at the same time, it makes clear that lien avoidance under § 506(d) is intended to be provisional, subject to reinstatement at least upon dismissal of the case.

There is a much stronger reason why § 506 is not a stand-alone mechanism available to avoid a lien that is undersecured or unsecured by the value of the collateral. There is no such thing as a Chapter 5 case. Rather, it is a provision that has to be utilized in the context of a case brought under Chapters 7, 11, 12 or

13. *Dewsnup* has already instructed that notwithstanding the language of § 506, the remedy of § 506(d) is not available in Chapter 7 cases. Chapters 13 and 11 have their own limitation on its use under those Chapters, to the extent it is necessary to look to § 506(d) at all, especially after *Dewsnup.* Section 1322(b)(2) provides that a Chapter 13 plan "may—(2) modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence...." Section 1123(d)(5) provides an identical limitation on any effort to strip down a lien secured by the "debtor's principal residence" in a Chapter 11 case. That further illustrates that to the extent § 506(d) has any applicability in Chapter 13 or 11 cases it cannot be a stand-alone provision because it has no such limitation within it. In other words, if it were a stand-alone mechanism for lien avoidance, then it would make no difference if the collateral was the debtor's principal residence. So the statutes would conflict, and the specific provision applicable to Chapter 13 or Chapter 11 cases would control. See, e.g., *In re Hill,* 440 B.R. 176, 180–81 (Bankr.S.D.Ca.2010); *In re Fenn,* 428 B.R. 494, 501 (Bankr.N.D.Ill. 2010).

The Supreme Court put an implicit point on the argument that § 506 is not a stand-alone mechanism in *Nobelman v. American Savings Bank,* 508 U.S. 324, 113 S.Ct. 2106, 124 L.Ed.2d 228 (1993). There, a unanimous Court held that the limiting language of § 1322(b)(2) applied to prevent a Chapter 13 debtor from stripping down the undersecured portion of the home loan secured by debtor's principal residence.

The *Nobelman* decision is instructive in multiple ways. The basic facts were uncontroverted. Debtors fell behind on the home loan on their principal residence, so they filed a Chapter 13 case. The value of the property was uncontroverted, and was about 1/3 of the amount of the debt. Debtors proposed to pay only the current value, and treat the difference as unsecured, with unsecured creditors receiving nothing. Debtors argued that the anti-modification language of § 1322(b)(2) "applies only to the extent the mortgagee holds a 'secured claim' in the debtor's residence and that we must look first to § 506(a) to determine the value of the mortgagee's 'secured claim.'" 508 U.S. at 328, 113 S.Ct. 2106. The Court continued to explain the debtors' syllogism:

> Section 506(a) provides that an allowed claim secured by a lien on the debtor's property "is a secured claim to the extent of the value of [the] property"; to the extent the claim exceeds the value of the property, it "is an unsecured claim." Petitioners contend that the valuation provided for in § 506(a) operates automatically to adjust downward the amount of a lender's undersecured home mortgage before any disposition proposed in the debtor's Chapter 13 plan.

*Id.*

The *Nobelman* Court responded to the debtors' argument with an important discussion. The Court states:

> This interpretation fails to take adequate account of § 1322(b)(2)'s focus on "rights." That provision does not state that a plan may modify "claims" or that the plan may not modify "a claim secured only by" a home mortgage. Rather, it focuses on the modification of the *"rights of holders"* of such claims. By virtue of its mortgage contract with petitioners, the bank is indisputably the holder of a claim secured by a lien on petitioners' home.

*Id.* The Court recognized that applying § 506(a) in this case would acknowledge the bank had a secured claim for the value of the property; "however, that determination does not necessarily mean that the

'rights' the bank enjoys as a mortgagee, which are protected by § 1322(b)(2), are limited by the valuation of its secured claim." 508 U.S. at 329, 113 S.Ct. 2106.

The Court continued:

> The term "rights" is nowhere defined in the Bankruptcy Code. In the absence of a controlling federal rule, we generally assume that Congress has "left the determination of property rights in the assets of a bankrupt's estate to state law," since such "[p]roperty interests are created and defined by state law." [Citations omitted.] Moreover, we have specifically recognized that "[t]he justifications for application of state law are not limited to ownership interests," but "apply with equal force to security interests, including the interest of a mortgagee." [Citation omitted.] The bank's "rights," therefore, are reflected in the relevant mortgage instruments, which are enforceable under Texas law. They include the right to repayment of the principal in monthly installments over a fixed term at specified adjustable rates of interest, the right to retain the lien until the debt is paid off, the right to accelerate the loan upon default and to proceed against petitioners' residence by foreclosure and public sale, and the right to bring an action to recover any deficiency remaining after foreclosure.... These are the rights that were "bargained for by the mortgagor and the mortgagee," ... and are rights protected from modification by § 1322(b)(2).

508 U.S. at 329–30, 113 S.Ct. 2106.

The *Nobelman* Court next returned to the debtors' argument that the anti-modification language of § 1322(b)(2) only applied to the secured portion of the bank's claim, after putting the claim through the § 506(a) wringer. Indeed, the Ninth Circuit Court of Appeals had previously so held in *In re Hougland*, 886 F.2d 1182 (1989). While acknowledging that such a construction of § 1322(b)(2) was "quite sensible as a matter of grammar", (508 U.S. at 330, 113 S.Ct. 2106), it did not fit structurally because Congress chose a different set of words:

> Congress chose to use the phrase "claim secured ... by" in § 1322(b)(2)'s exception, rather than repeating the term of art "secured claim." The unqualified word "claim" is broadly defined under the Code to encompass any "right to payment, whether ... secure[d] or unsecured" or any "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether secure[d] or unsecured." 11 U.S.C. § 101(5) (1988 ed., Supp. III). It is also plausible, therefore, to read "a claim secured only by a [homestead lien]" as referring to the lienholder's entire claim, including both the secured and the unsecured components of the claim. Indeed, § 506(a) itself uses the phrase "claim ... secured by a lien" to encompass both portions of an undersecured claim.

508 U.S. at 331, 113 S.Ct. 2106. The Court chose the latter interpretation rather than debtors', and held that § 1322(b)(2) prohibited modification of any part of the bank's lien.

Shortly before the Supreme Court considered *Nobelman*, it decided *Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), which is helpful in understanding the nature of the obligation that remains from a secured obligation after the obligor receives a Chapter 7 discharge. There, the Court explained:

> A mortgage is an interest in real property that secures a creditor's right to repayment. But unless the debtor and creditor have provided otherwise, the creditor ordinarily is not limited to foreclosure on the mortgaged property

should the debtor default on his obligation; rather, the creditor may in addition sue to establish the debtor's *in personam* liability for any deficiency on the debt and may enforce any judgment against the debtor's assets generally. [Citation omitted.] A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. 11 U.S.C. § 727. However, such a discharge extinguishes *only* "the personal liability of the debtor." 11 U.S.C. § 524(a)(1). Codifying the rule of *Long v. Bullard*, [citation omitted] the Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy.

501 U.S. at 82–83, 111 S.Ct. 2150.

The *Johnson* Court then examined the concept of a claim, as defined under 11 U.S.C. § 101(5), and as understood in prior decisions. The Court stated:

> Applying the teachings of [*Pennsylvania Dept. Of Public Welfare v.*] *Davenport* [,495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) ], we have no trouble concluding that a mortgage interest that survives the discharge of a debtor's personal liability is a "claim" within the terms of § 101(5). Even after the debtor's personal obligations have been extinguished, the mortgage holder still retains a "right to payment" in the form of its right to the proceeds from the sale of the debtor's property. Alternatively, the creditor's surviving right to foreclose on the mortgage can be viewed as a "right to an equitable remedy" for the debtor's default on the underlying obligation. Either way, there can be no doubt that the surviving mortgage interest corresponds to an "enforceable obligation" of the debtor.

501 U.S. at 84, 111 S.Ct. 2150. The Court then stated its conclusion:

> The Court of Appeals thus erred in concluding that the discharge of petitioner's *personal liability* on his promissory notes constituted the complete termination of the Bank's *claim* against petitioner. Rather, a bankruptcy discharge extinguishes only one mode of enforcing a claim—namely, an action against the debtor *in personam*—while leaving intact another—namely, an action against the debtor *in rem*.

*Id.* The Court continued:

> In other words, the court must allow the claim if it is enforceable against *either* the debtor *or* his property. Thus, § 502(b)(1) contemplates circumstances in which a "claim," like the mortgage lien that passes through a Chapter 7 proceeding, may consist of nothing more than an obligation enforceable against the debtor's property. Similarly, § 102(2) establishes, as a "[r]ul[e] of construction," that the phrase " 'claim against the debtor' includes claim against property of the debtor." A fair reading of § 102(2) is that a creditor who, like the Bank in this case, has a claim enforceable only against the debtor's property nonetheless has a "claim against the debtor" for purposes of the Code.

501 U.S. at 85, 111 S.Ct. 2150.

The *Johnson* Court found support for its view in the legislative history of § 102. The Court noted:

> The legislative history surrounding § 102(2) directly corroborates this inference. The Committee Reports accompanying § 102(2) explain that this rule of construction contemplates, *inter alia*, "nonrecourse loan agreements where the creditor's only rights are against property of the debtor and not against the debtor personally." [Citation omitted.] Insofar as the mortgage interest that passes through a Chapter 7 liquidation is enforceable only against the debtor's property, this interest has the

same properties as a nonrecourse loan.... [I]nsofar as Congress did not expressly limit § 102(2) to nonrecourse loans but rather chose general language broad enough to encompass such obligations, we understand Congress' intent to be that § 102(2) extend to all interests having the relevant attributes of nonrecourse obligations regardless of how these interests come into existence.

501 U.S. at 86–87, 111 S.Ct. 2150.

### Discussion

 Courts generally accept the guidance of *Dewsnup v. Timm*, 502 U.S. 410, 417–18, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992) and recognize that a debtor, after completing a Chapter 7, receives a discharge of his or her personal liability on non-reaffirmed debts. At the same time, creditors' lien rights ride through the Chapter 7 and remain obligations secured by the creditors' state law lien rights in property, although the debtor's personal obligation has been discharged. As *Johnson v. Home State Bank*, 501 U.S. 78, 85–86, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) describes it, the creditor's recourse after a Chapter 7 discharge is only to its state law rights in its collateral, but are now nonrecourse as to the debtor personally. That is the status of the debtor vis-a-vis the creditors with lien rights on the eve of the debtor now filing a Chapter 13 petition after receiving a Chapter 7 discharge.

What happens next, upon filing the Chapter 13 petition, is little short of alchemy for the debtor who owns real property which is the debtor's principal residence and is encumbered by a junior lien attached to no equity in the residence because the senior lienholder is owed more than the property is worth. With a wave of the virtual wand of 11 U.S.C. § 506(a), one instantly determines that for purposes of the Chapter 13 case the creditor's bundle of state law rights in the property have disappeared. That is the instruction of the Ninth Circuit Court of Appeals in *In re Zimmer*, 313 F.3d 1220 (2002), as anticipated by the Ninth Circuit Bankruptcy Appellate Panel in *In re Lam*, 211 B.R. 36 (1996). As a practical matter, the disappearance occurs immediately under *In re Scovis*, 249 F.3d 975 (9th Cir.2001), even before formally resorting to procedures of avoidance of lien interests.

The foregoing process is ably discussed by the court in *In re Okosisi*, 451 B.R. 90 (Bankr.D.Nev.2011). There, the court also explains why the anti-modification language of 11 U.S.C. § 1322(b)(2) does not apply to a lien wholly unsecured under 11 U.S.C. § 506(a). Simply stated, § 1322(b)(2) applies to holders of secured claims. Under *Zimmer* and § 506(a) the creditor with state law lien rights is not secured where there is no value to which those lien rights can attach at the time of filing the petition. It is sort of a "which comes first, the chicken or the egg" proposition. In the Ninth Circuit, the § 506(a) analysis comes first. Some courts elsewhere start from the premise that the creditor was brought into the case with enforceable lien rights and therefore is a secured creditor. That shapes their analysis in decisions such as *In re Fenn*, 428 B.R. 494 (Bankr.N.D.Ill.2010); *In re Gerardin*, 447 B.R. 342 (Bankr.S.D.Fla.2011). Those courts were led to the protections for secured creditors found in 11 U.S.C. § 1325(a) because they proceeded on the premise that the lien interest creditor with no collateral value was still a secured creditor, despite § 506(a). While there is appeal to the argument that it is performance of the reorganization plan—whether in Chapter 13 or 11—that effectuates the strip-off of the wholly unsecured junior lien, *Scovis* and *Zimmer* hold otherwise, and if it is correct that a creditor's status as secured or unsecured is determined at the instant of filing, as both opinions instruct, then it is sequentially logical that

the creditor's status is determined prior in time to the confirmation of the reorganization plan, or even its successful completion.

This Court has held, as have many others, that the inability of a debtor to receive a Chapter 13 discharge in a case filed within four years of filing under Chapter 7 and receiving a discharge there, does not make the debtor ineligible to file the Chapter 13. *In re Burnett,* 427 B.R. 517, 521 (2010); *In re Casey,* 428 B.R. 519, 522–23 (2010). In *Burnett* and *Casey,* the Court noted the statutory requirements for all Chapter 13 plans set out in 11 U.S.C. § 1322(a)(3) and (a)(7) regarding good faith. And courts have been examining proposed Chapter 13 plans to assess the good faith issues in determining whether to confirm those plans. *In re Tran,* 431 B.R. 230 (Bankr.N.D.Ca.2010); *In re Hill,* 440 B.R. 176 (Bankr.S.D.Ca.2010); *In re Frazier,* 448 B.R. 803 (Bankr.E.D.Ca. 2011); *In re Okosisi,* 451 B.R. 90 (Bankr. D.Nev.2011).

Accordingly, the most important issue in this case is: What does a Chapter 20 debtor wind up with at the end of a successful performance of a no-discharge Chapter 13? Courts are looking for an answer, and the answer may not be free from conflicting opinions.

As already noted, debtors argue that after adoption of BAPCPA in 2005, there is a "fourth option" for concluding a Chapter 13 case, in addition to the options of dismissal, conversion and discharge which were recognized by the Ninth Circuit in *In re Leavitt,* 171 F.3d 1219 (1999). Debtors cited no authority in support of their argument, but support has arisen since they filed their pleadings, in form of the decision *In re Okosisi,* 451 B.R. 90 (Bankr. D.Nev.2011). There, the court phrased the issue as follows:

> Having determined that nothing in the Bankruptcy Code prevents the chapter 20 debtor from avoiding a lien, the court

now turns to the question of when this avoidance becomes permanent. Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") by Congress in 2005, chapter 13 cases could end in one of three ways: conversion, dismissal, or discharge. *In re Leavitt,* 171 F.3d 1219, 1223 (9th Cir.1999). Furthermore, actions taken to avoid a lien are undone if a case is dismissed or converted prior to the successful completion of all plan payments, . . . .

However, BAPCPA added Section 1328(f), and thus opened up the possibility of a fourth option, the completion of all plan payments without a discharge. In this post-BAPCPA regime, lien avoidance actions are still undone if the chapter 13 case is converted or dismissed, as the operation of those Code provisions was not changed. In cases where the chapter 13 debtor is not eligible for a discharge because of Section 1328(f), the proper determination of the permanency of any action to avoid a lien is less settled.

While the *Okosisi* court continued on, it is important to stop at this point to examine the premise of a lien strip in a no-discharge Chapter 13 becoming "permanent". The *Okosisi* court acknowledges that prior to BAPCPA, the only way a lien strip became permanent in any Chapter 13 case was through discharge. That was at a time when there was no § 1328(f) barring any Chapter 13 discharge, even on the heels of a Chapter 7 discharge. The lien strip could not be "permanent" if the case was dismissed because 11 U.S.C. § 349(b)(1)(C) expressly reinstated any such lien avoided under § 506(d). The same result obtained pre-BAPCPA for a case converted from Chapter 13 to Chapter 7 because of *Dewsnup v. Timm,* 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903 (1992). So, as the Ninth Circuit made

clear in *In re Leavitt*, 171 F.3d 1219 (1999), the only ways out of a Chapter 13 case pre-BAPCPA were conversion, dismissal or discharge, as the *Okosisi* court recognizes. Moreover, the only way to "permanently" maintain a lien strip obtained in the Chapter 13 was through discharge because it was lost on conversion or dismissal.

It is important to note that Congress fully understood how to make lien avoidances "permanent", which they achieved for avoidance of certain liens that impair exemptions under 11 U.S.C. § 522(f). Unlike liens avoided under § 506(d), liens avoided under § 522(f) are not reinstated on dismissal, nor set aside on conversion. Had Congress intended avoidance of liens under § 506(d) to be "permanent", other than by discharge, they easily could have so provided.

Congress wanted to make "non-permanence" even more clear when it amended the conversion statute, 11 U.S.C. § 348, as part of BAPCPA in 2005. There, Congress provided in § 348(f)(1)(C)(i):

> (C) with respect to cases converted from chapter 13—
>
> (i) the claim of any creditor holding security as of the date of the filing of the petition shall continue to be secured by that security unless the full amount of such claim determined under applicable nonbankruptcy law has been paid in full as of the date of conversion, notwithstanding any valuation or determination of the amount of an allowed secured claim made for the purposes of the case under chapter 13; . . . .

In other words, before enactment of BAPCPA, even when a debtor was eligible for a discharge, the only way to make "permanent" a lien strip under § 506(d) and § 1322(b) was to earn a discharge. Moreover, Congress strengthened its statement of that intent by its amendment of § 348(f).

■ It has long been axiomatic that when Congress passes a law, it is presumed to know and understand the then-current state of affairs, both legally and factually. As stated long ago by the Supreme Court in *Lindsey, et al. v. Lessee of Miller*, 31 U.S. 666, 669, 6 Pet. 666, 8 L.Ed. 538 (1832):

> When in 1807 congress passed the law, they must be presumed to have legislated on the then existing state of things. It was then well known that there were lands held under claims drawn under surveys made for services in the Virginia state line. It must be presumed the act was intended to apply to those cases.

In *In re Bonner Mall Partnership*, 2 F.3d 899 (9th Cir.1993), the court stated: "The Bankruptcy Code should not be read to abandon past bankruptcy practice absent a clear indication that Congress intended to do so." 2 F.3d at 912. And, paraphrasing *Dewsnup*, the Ninth Circuit said:

> Where the text of the Code does not unambiguously abrogate pre-Code practice, courts should presume that Congress intended it to continue unless the legislative history dictates a contrary result.

2 F.3d at 913.

Seemingly overlooked in discussions of what happens to a lien strip in a no-discharge Chapter 20 is what happens to the other debts a debtor proposes to pay in whole or in part through the Chapter 13 plan. By way of example, in *In re Tran* the court found that Tran was not proceeding in good faith because her only objective was to strip off the junior lien, which she could not accomplish in her preceding Chapter 7. 431 B.R. at 237. Courts which have found good faith in the Chapter 20 context have found there were other debts

to be addressed in the Chapter 13. It is appropriate to consider what happens to these debts, along with the unsecured non-recourse debt of the junior lien creditor in understanding what happens at the end of a no-discharge Chapter 13 case.

As this Court discussed previously in *In re Casey*, 428 B.R. 519, 522 (2010):

> Under the Bankruptcy Code, there are two ways to make an enforceable debt go away permanently. One is to pay it, in full. The other is to obtain a discharge of any remaining obligation.

This Court then reviewed the decision in *In re Lilly*, 378 B.R. 232 (Bankr.C.D.Ill. 2007) which was a Chapter 20 case. In the Chapter 13, the debtor proposed to reduce the contract rate of interest on a vehicle for the duration of the plan. The *Lilly* court noted:

> When a debtor does not receive a discharge, however, any modification to a creditor's rights imposed in the plan are not permanent and have no binding effect once the term of the plan ends. *See In re Ransom*, 336 B.R. 790 (9th Cir.BAP2005) (post petition interest on nondischargeable student loan continued to accrue at the contract rate and could be collected after Chapter 13 case terminated); *In re Holway*, 237 B.R. 217 (Bankr.M.D.Fla.1999) (tax debt continued to accrue interest and penalties postpetition where debtor did not receive Chapter 13 discharge); *In re Place*, 173 B.R. 911 (Bankr.E.D.Ark. 1994) (where Chapter 13 case was dismissed without discharge, accrual of interest on tax debt was not affected by pendency of bankruptcy case).

378 B.R. at 236. The *Lilly* court found:

> A debtor who files a Chapter 13 case despite not being eligible for a discharge, nevertheless has the power to modify a secured creditor's rights under Section 1322(b)(2), and the power to pay the creditor's claim with interest at the *Till* rate under Section 1325(a)(5)(B)(ii). Without a discharge, however these modifications are effective only for the term of the plan. The DEBTOR remains liable for the full amount of the underlying debt determined under non-bankruptcy law, including her liability for interest calculated at the contract rate. If the interest rate reduction achieved under a confirmed plan was determined to be permanent and binding on the creditor, that would result in a *de facto* discharge of a portion of the underlying debt, a benefit to which the DEBTOR is not entitled. Once the plan is completed, the DEBTOR remains liable for the balance of the "underlying debt determined under nonbankruptcy law"....

378 B.R. at 236–37.

In *Bruning v. United States*, 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964), the debtor had been assessed for prepetition unpaid taxes. During bankruptcy a small portion of the debt was paid on the IRS claim pursuant to a proof of claim filed by the IRS. The debtor acknowledged his liability on the underlying debt but contended the IRS could not seek postpetition interest on that debt since it chose to file a claim and receive a distribution. Writing for a unanimous court, Chief Justice Warren wrote that debtor's personal liability for post petition interest on the nondischargeable debt remained the debtor's personal obligation.

*In re Pardee*, 218 B.R. 916 (9th Cir. BAP 1998) involved a Chapter 13 plan that provided for full payment of the principal and prepetition interest on a nondischargeable student loan. Even though the plan paid that debt in full, postpetition interest accrued over the life of the plan and was itself nondischargeable. It was the personal liability of the debtor and could be collected from his post-discharge.

The Ninth Circuit Court of Appeals reached the same conclusion with respect to a Chapter 13 debtor who made full payment of a child support debt. Again, postpetition interest accrued and could be collected post-discharge from the debtor. *In re Foster*, 319 F.3d 495 (9th Cir.2003).

The Bankruptcy Appellate Panel of the Ninth Circuit reiterated it's holding in *Pardee* in *In re Ransom*, 336 B.R. 790 (2005), rev'd on other ground in *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193 (9th Cir.2008), again holding that post-petition interest accrued during the life of the Chapter 13 plan and was the personal obligation of the debtor post-petition.

*In re Lewis*, 339 B.R. 814 (Bankr. S.D.Ga.2006) is a decision made after enactment of BAPCPA and therefore does not directly represent a part of the body of law Congress is presumed to have understood at the time. But the decision does reflect the continued understanding of the continuing liability for a debt that is not paid in full or any remaining balance discharged. In discussing the issue of "unreasonable delay" in the context of possible confirmation of a no-discharge Chapter 13, the court noted:

> Obviously, with the filing of these chapter 13 cases and the reimposition of the § 362 stay, all the debtors' creditors are delayed in pursuing their obligations under applicable non-bankruptcy law, but because a creditor might be required to wait to pursue the balance remaining under the obligation after conclusion of the case standing alone does not establish an *unreasonable delay*.

339 B.R. at 817.

■ With all the foregoing state of the law before the Congress when it enacted BAPCPA, the *Okosisi* court, while paying lip service to *Leavitt*, chooses to ignore the legal fact *Leavitt* makes clear—that the only way to make a lien strip "permanent" is by discharge because conversion or dismissal reinstates the avoided lien—and instead declares:

> At the successful completion of all payments in a no-discharge chapter 13 case, no order discharging the debtor will be entered because the debtor is not eligible for a discharge. 11 U.S.C. § 1328(f). The court finds that in this situation the proper result is for the court to close the case without discharge. . . .
>
> The enactment of BAPCPA created a fourth option for the end result of a chapter 13 case, and *Leavitt*, as a result, is now incomplete. To the available options of discharge, dismissal, and conversion, the fourth option of closed without discharge must now be added.

*Id.*

Distilled, the essence of the foregoing is that the *Okosisi* court first invents the idea that enactment of § 1328(f) "created a fourth option" and then that the pre-BAPCPA *Leavitt* decision "as a result, is now incomplete." Further, that a "fourth option"—invented by the court, not Congress—must be added to the *Leavitt* trilogy.

While this Court does not believe a court-invented "fourth option" is either appropriate or necessary in light of Congress' established intent, both debtors and the *Okosisi* court are not alone in considering it as a way to conclude a no-discharge case. While § 1328(f) was purposefully added by Congress in 2005 to emphatically declare "no discharge in Chapter 13 if you already received one in Chapter 7" within the time period set out, as the debtors have argued (without citation to authority), there have been other circumstances within the Bankruptcy Code when Congress said "no discharge". One such provision is 11 U.S.C. § 727(a)(8), which precludes

granting a discharge if a debtor had received one under Chapter 7 or 11 within the preceding (now) 8 years. The statute does not say that a debtor having received a discharge cannot file a case under one of those chapters, just that debtor cannot receive a discharge—in contrast with 11 U.S.C. § 109(g), which says a debtor cannot file a petition. In *In re Asay*, 364 B.R. 423 (Bankr.D.N.M.2007), the court was faced with the specific question of whether it could, on its own initiative, deny the debtors a discharge because they were ineligible to receive one, even though no party in interest had timely commenced an adversary proceeding seeking denial under 11 U.S.C. § 727. After concluding that § 727(a)(8) took precedence over Rule 4004(c), and without discussion of the process it chose, the court simply ordered "that this bankruptcy proceeding be closed without the entry of a discharge." 364 B.R. at 427.

The Victorios are also correct in observing that courts presently employ a closing without discharge in cases where a debtor fails to complete a financial management course. Congress simply provided in § 727(a)(11) that a debtor should not receive a discharge, although otherwise eligible for one. Congress was silent on how such a case should be handled administratively, and the Rules Committee of the Judicial Conference proposed Rule 4006, Federal Rules of Bankruptcy Procedure, which obliquely addresses the issue when it states:

> If an order is entered: . . .; or in the case of an individual debtor, closing the case without the entry of a discharge, the clerk shall promptly notify all parties in interest in the manner provided by Rule 2002.

There is nothing in any of the foregoing which even hints that Congress intended to change the pre-existing state of the law that the only way a debtor could make a lien strip "permanent" was through a discharge, because the lien was expressly reinstated upon dismissal or conversion. To suggest that Congress should be thought to have wittingly or otherwise abrogated that requirement by adoption of § 1328(f) strains credulity, especially when one contemplates that § 1328(f) was adopted to restrict the relief a serial filing debtor could obtain if the later filing was within a specified time after the earlier discharged case.

It is appropriate to note that the act of closing without a discharge creates problems of its own for a debtor. The automatic stay of an act other than against property of the estate terminates on the closing of the case under 11 U.S.C. § 362(c)(2)(A). There is no discharge injunction arising from the Chapter 13 because there is no discharge. Moreover, property of the estate that was identified in a debtor's Schedules in accordance with 11 U.S.C. § 521(a)1 is deemed abandoned to the debtor upon closing, in accordance with 11 U.S.C. § 554(c), so the property is *no* longer protected by any stay or injunction. So the debts addressed in the Chapter 13, but not paid in full through the plan, still exist because they have not been either satisfied under nonbankruptcy law nor discharged in bankruptcy. And there is nothing in the Bankruptcy Code to prevent creditors from endeavoring to collect the remaining debts.

The *Okosisi* opinion has a curious section captioned: "The Misnomer of the So-called 'De-facto Discharge'". Curious, because the opinion elsewhere discusses its view of the "permanence" of the lien strip, meaning the estate's liability for the debt has been rendered "permanently" uncollectable. As already noted, in bankruptcy there are two ways to make a debt go away permanently. One is to pay it, in full. The other is to provide for it in a

plan, pay none or some of it through a plan, and obtain a discharge of any unpaid portion. Congress has made a policy choice in § 1328(f) in declaring there shall be no discharge in a Chapter 13 that follows a Chapter 7 discharge in the four years immediately preceding. A discharge in bankruptcy is effectuated by the provisions of 11 U.S.C. § 524. As it states there, a discharge "operates as an injunction" against collection of any debt discharged in the bankruptcy. Conversely, without a discharge, there is no discharge injunction. Yet the debtors and the *Okosisi* court would create a new "permanent" bar to collection of all the debts provided for in the debtors' Chapter 13 plan, even though under § 1328(f) there can be no discharge. A "permanent" bar to collection of an otherwise outstanding debt is very properly called a "de facto discharge", because that is the result the opinion endorses. The discharge is the ultimate reward of bankruptcy [Tabb, "The Historical Evolution of the Bankruptcy Discharge", 65 Am. Bankr.L.J. 325 (1991)], and attempting to devise mechanisms to achieve a *de facto* discharge of liability when Congress says "no discharge", is to attempt an end run of a clear mandate.

Driving the effort of the *Okosisi* court to create a "fourth option" for ending a Chapter 13 case is the argument that the traditional three exits of *Leavitt* do not fit fully after enactment of § 1328(f). The *Okosisi* court stated its view in Fn.10:

While other courts have determined that dismissal is the appropriate outcome upon the completion of plan payments, this is inappropriate because dismissal of a chapter 13 case is only to occur either voluntarily or for cause. 11 U.S.C. § 1307. Because dismissal is addressed in Section 1307, and because the successful completion of all plan payments does not constitute cause for dismissal under subsection(c) of section 1307, it is inappropriate for the case to be dismissed upon the successful completion of all plan payments.

The foregoing characterization appears intentionally phrased to deflect review of § 1307(c)(1), which provides as a ground for conversion or dismissal "unreasonable delay by the debtor that is prejudicial to creditors." While a plan may be reasonable and in good faith at the time of confirmation, if at the end of required payments some portion of the debts remain unpaid, and no discharge is available, then a party in interest or the United States Trustee may move to dismiss because the delay beyond the plan term may no longer be reasonable. As already discussed, unless paid in full during the plan term, the creditors are entitled to collect the unpaid portion of the debts owed to them unless the debts are discharged. With no discharge available and no discharge injunction either, any other reading affords debtors a *de facto* discharge, which flies directly in the face of Congress' intent as declared in § 1328(f). It would be ironic if Congress should be understood to have declared that if a debtor eligible for a discharge is unable to complete a Chapter 13 case involving a § 506(d) lien strip, then the avoided lien is reinstated (as § 349 states), but a debtor *not* eligible for a discharge in a Chapter 20 can just have the case closed and thereby make the lien avoidance "permanent", as asserted in the rationale of *Okosisi*, as well as the debtors' arguments. This Court has found no support for such an outcome in BAPCPA, nor in pre-BAPCPA practice.

After all the supplemental briefing was submitted by the parties on the Chapter 13 trustee's objection to confirmation of debtors' Chapter 13 plan, the debtors filed an objection to the proof of claim filed by CitiMortgage in this case. The sole ground asserted was: "The claim was listed and discharged in the debtors prior ch.

7 case, 07–06247, filed on 10/31/07 and discharged on 2/5/08. The claim should be disallowed in its entirety." CitiMortgage filed no opposition, and another judge of this court signed an order sustaining the unopposed objection. There is a problem, however, because the objection and resulting order are incomplete—and therefore ambiguous—as more fully discussed, *supra*, in the discussion of the Supreme Court's decision in *Johnson v. Home State Bank*, 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991). There, it is made clear that the *personal liability* of the debtors *was* discharged in the preceding Chapter 7 case. However, under 11 U.S.C. § 102, the creditor still has a claim against the debtors' estate. Here, neither the objection to CitiMortgage's claim, nor the order drafted and submitted by debtors made any distinction between the two facets implicit in CitiMortgage's claim. Debtors are correct that the objection to the claim, to the extent the claim is based on the debtors' personal liability, should be sustained. However, to the extent their objection was to the estate's liability on CitiMortgage's claim, it should be overruled.

CitiMortgage's proof of claim was for $91,538.46. Debtors have not objected to the amount. Accordingly, CitiMortgage still has an unsecured claim in this case, in accordance with *Johnson* and 11 U.S.C. § 102, in the amount of $91,538.46. Debtors' Plan calls for payments of $400 per month to the Chapter 13 trustee, and for the trustee to pay 100% of the unsecured claims. However, at that amount it would take debtors over 228 months just to pay the CitiMortgage claim, not including the other scheduled unsecured debts. Accordingly, as presently proposed as a 100% dividend to unsecured creditors, the Plan is not confirmable.

In their Reply brief, debtors argue that the value of CitiMortgage's claim is $0. This Court rejects that argument, as have others. At least in part because the argument conflates the value of the claim as secured with the value of the claim as unsecured, arguing that as unsecured it was discharged in the prior Chapter 7. As already discussed, only the personal liability was discharged, while *Johnson* and § 102 make clear CitiMortgage continues to have a claim against the estate. *In re Hill.* 440 B.R. 176, 184 (Bankr.S.D.Ca. 2010); *In re Frazier*, 448 B.R. 803, 811 (Bankr.E.D.Ca.2011); *In re Okosisi*, 451 B.R. 90, at n. 8 (Bankr.D.Nev.2011).

### *Conclusion*

For all the foregoing reasons, the Court finds and concludes that debtors in a Chapter 20 case cannot "permanently" avoid a wholly unsecured junior lien without a discharge, or without paying it in full. They could not do so before BAPCPA, and there is nothing in the 2005 amendments that even hints that Congress believed that any ending other than conversion or dismissal was possible, much less desirable, as emphatically demonstrated by the amendments to 11 U.S.C. § 348 and § 1328(f).

Accordingly, the Court finds and concludes that as currently proposed the debtors' Chapter 13 Plan is not confirmable because it cannot be timely completed in 60 months with 100% payment to unsecured creditors while making monthly payments of $400. Debtors shall be allowed forty-five (45) days to file and serve an amended plan consistent with the foregoing.

IT IS SO ORDERED.